July Term, 1820.

THE STATE v. LASSELLE.

Wednesday, July 19.

---

## The STATE *v.* LASSELLE.

Slavery is entirely prohibited within the state of *Indiana*, by the express words of the constitution.

Saturday, July 22.

APPEAL from the *Knox* Circuit Court.—*Polly*, a woman of colour, was brought before the Circuit Court by *Lasselle*, in obedience to a writ of *habeas corpus*. He stated in his return that he held her by purchase as his slave; she being the issue of a

coloured woman purchased from the *Indians* in the territory north-west of the river *Ohio*, previously to the treaty of *Greenville* and cession of that territory to the *United States.*—The Court below remanded the woman to the custody of *Lasselle.*

SCOTT, J.—The question before this Court is, as to the legality of *Lasselle's* claim to hold *Polly* as his slave. This question has been presented before us with an elaborate research into the origin of our rights and privileges, and their progress until the formation of our state government, in 1816. On one hand, it is contended that, by the ordinance for the government of the territory north-west of the river *Ohio*, and by the constitution of *Indiana*, slavery was, and is, decidedly excluded from this state; while, on the other hand, it is insisted that, by the act of cession of the state of *Virginia*, and by the ordinance of 1787, the privilege of holding slaves was reserved to those settlers at *Kaskaskies* and *St. Vincents*, and the neighbouring villages, who, prior to that time, had professed to be citizens of *Virginia*; and that they had a vested right, which could not be devested by any provision of the constitution.

In deciding this case, it is not necessary for us to recur to the earliest settlement of the country, and inquire what rights the first emigrants enjoyed, as citizens of *Virginia*; or what privileges were secured to them, when their connexion with that state was dissolved. Whether the state of *Virginia* intended, by consenting to the ordinance of 1787, to emancipate the slaves on this side the *Ohio* river, or whether by the reservation alluded to, she intended to continue the privilege of holding slaves, to the settlers then in the country, is unimportant in the present case. That legislative authority, uncontrolled by any constitutional provision, could emancipate slaves will hardly be denied. This has been done in several of the states, and no doubt has been entertained, either of the power of the legislature to enact such a statute, or of the binding force and efficacy of the law when enacted. By the power of a statute, an estate may be made to cease, in the same manner as if the party possessing it were dead. A man may, by statute, be made an heir, who could not otherwise be one. The legislature have the power to change the course of descents, so as to cast an estate upon those who, otherwise, could never have taken it by inheritance. This doctrine is sanctioned by the authority of Coke, Levinz, Blackstone, Bacon, and others of the first respectability. It must be admitted

July Term,
1820.

THE STATE
v.
LASSELLE.

that a convention, chosen for the express purpose, and vested with full power, to form a constitution which is to define, limit, and control the powers of the legislature, as well as the other branches of the government, must possess powers, at least e-qual, if not paramount, to those of any ordinary legislative body. From these positions it clearly follows, that it was within the legitimate powers of the convention, in forming our constitution, to prohibit the existence of slavery in the state of *Indiana.* We are, then, only to look into our own constitution, to learn the nature and extent of our civil rights; and to that instrument a-lone we must resort for a decision of this question. In the first article of the constitution, section 1st, it is declared, "That all men are born equally free and independent; and have certain natural, inherent, and unalienable rights; among which are, the enjoying and defending of life and liberty, and of acquiring, possessing, and protecting property; and pursuing, and obtain-ing happiness and safety." Section 24th, of the same article, guards against any encroachment on those rights, and provides that they shall forever remain inviolable. In the 11th article of that instrument, section 7th, it is declared, that "*There shall be neither slavery nor involuntary servitude in this state, otherwise than for the punishment of crimes, whereof the party shall have been duly convicted.*" It is evident that, by these provisions, the fra-mers of our constitution intended a total and entire prohibition of slavery in this state; and we can conceive of no form of words in which that intention could have been more clearly expressed.

We are told that the constitution recognizes pre-existing rights, which are to continue as if no change had taken place in the government. But it must be recollected that a special reserva-tion cannot be so enlarged by construction, as to defeat a gen-eral provision. If this reservation were allowed to apply in this case, it would contradict, and totally destroy, the design and effect of this part of the constitution. And it cannot be presumed that the constitution, which is the collected voice of the citizens of *Indiana,* declaring their united will, would gua-ranty to one part of the community such privileges as would totally defeat and destroy privileges and rights guarantied to a-nother. From these premises it follows, as an irresistible con-clusion, that, under our present form of government, slavery can have no existence in the state of *Indiana*; and, of course, the claim of the said *Lasselle* cannot be supported.

*Per Curiam.*—The judgment is reversed, with costs, and the woman discharged.

*Kinney*, *Tabbs*, and *M'Donald*, for the state.

*Call*, for the appellee.