



FILED

Jun 30 2023, 9:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Indiana Supreme Court

Supreme Court Case No. 22S-PL-338

## Members of the Medical Licensing Board of Indiana, et al.,
*Appellants/Defendants,*

–v–

## Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc., et al.,
*Appellees/Plaintiffs.*

Argued: January 19, 2023 | Decided: June 30, 2023

Appeal from the Monroe Circuit Court
No. 53C06-2208-PL-1756
The Honorable Kelsey B. Hanlon, Special Judge

**Opinion by Justice Molter**

Chief Justice Rush and Justice Massa concur.
Justice Slaughter concurs in the judgment with separate opinion.
Justice Goff concurs in part and dissents in part with separate opinion.

**Molter, Justice.**

Abortion is an intractable issue because it brings two irreconcilable interests into conflict: a woman's interest in ending a pregnancy and the State's interest in protecting the life that abortion would end. Pregnancy is a highly personal experience that can alter a woman's life and health in countless ways. For some, a pregnancy may be planned, supported, or generally free of any significant health complications. But for others, a pregnancy may be unplanned, lacking significant support, or induce significant health complications. Given the nuance inherent in each woman's experience and private life, a woman's desire to continue or terminate a pregnancy is, likewise, intensely personal. At the same time, our laws have long reflected that Hoosiers, through their elected representatives, may collectively conclude that legal protections inherent in personhood commence before birth, so the State's broad authority to protect the public's health, welfare, and safety extends to protecting prenatal life.

Last summer, the General Assembly passed, and the Governor signed, Senate Bill 1, which balances these interests by broadly prohibiting abortion but making exceptions in three circumstances: (1) when an abortion is necessary either to save a woman's life or to prevent a serious health risk; (2) when there is a lethal fetal anomaly; or (3) when pregnancy results from rape or incest. Several abortion providers sued to invalidate the law, contending that a woman's right to "liberty" under Article 1, Section 1 of the Indiana Constitution encompasses a fundamental right to abortion, and that Senate Bill 1 materially burdens a woman's exercise of this right. On that constitutional basis, the trial court preliminarily enjoined the State from enforcing the law. Now, on appeal, the State seeks to vacate the injunction, arguing that the abortion providers lack standing; that Article 1, Section 1 is not judicially enforceable; and that even if it is, it does not protect a fundamental right to abortion.

We first hold that the providers have standing to contest the constitutionality of Senate Bill 1 because the statute criminalizes their work, and thus they face the sort of imminent, direct, personal injury our standing doctrine requires. Then, after examining Article 1, Section 1's

text, history, structure, and purpose, as well as our prior case law interpreting the provision, we hold that it is judicially enforceable. Finally, we hold that Article 1, Section 1 protects a woman's right to an abortion that is necessary to protect her life or to protect her from a serious health risk, but the General Assembly otherwise retains broad legislative discretion for determining whether and the extent to which to prohibit abortions.

Based on these holdings, we conclude the record does not support the preliminary injunction. The providers brought a "facial" challenge to the entire law, so they had to show a reasonable likelihood of success in proving there are no circumstances in which any part of Senate Bill 1 could ever be enforced consistent with Article 1, Section 1. Because there are such circumstances, the providers cannot show a reasonable likelihood of success on their facial challenge. We therefore vacate the preliminary injunction.

# Facts and Procedural History

## I. History of Indiana's Abortion Laws

For all of Indiana's history, abortion has been the subject of state lawmaking, and to the extent federal courts interpreting the Federal Constitution have permitted, the legislature has generally prohibited abortions except for pregnancies that threaten a woman's life. Rebecca S. Shoemaker, *The Indiana Bill of Rights: Two Hundred Years of Civil Liberties History*, *in The History of Indiana Law* 193, 204–05 (David J. Bodenhamer & Hon. Randall T. Shepard eds., 2006). Before statehood, the territorial government enacted a receiving statute adopting English law as of 1607,[1] *see* Act of Sept. 17, 1807, ch. XXIV, *in The Laws of Indiana Territory 1801-*

---

[1] The year 1607 was significant because it was the time of the English settlement at Jamestown. Ray F. Bowman, III, *English Common Law and Indiana Jurisprudence*, 30 Ind. L. Rev. 409, 413–14 n.25 (1997).

*1809* 323, 323 (Francis S. Philbrick ed., 1930), which criminalized abortion after "quickening"—"the first felt movement of the fetus in the womb, which usually occurs between the 16th and 18th week of pregnancy," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. ----, 142 S. Ct. 2228, 2249, 213 L. Ed. 2d 545 (2022). Indiana codified this reception provision again shortly after achieving statehood in 1816. Act of Jan. 2, 1818, ch. LII, § 1, 1818 Ind. Acts 308, 308–09.

Roughly two decades later, in 1835, the General Assembly passed its own statute criminalizing abortion, making it a crime to "wilfully administer to any pregnant woman, any medicine, drug, substance or thing whatever, or . . . use or employ any instrument or other means whatever, . . . to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman." Act of Feb. 7, 1835, ch. XLVII, § 3, 1835 Ind. Acts 66, 66. Then in 1852, one year after Indiana adopted its current Constitution, the General Assembly revised the statute to cover "any woman whom [the defendant] supposes to be pregnant." Ind. Rev. Stat. vol. II, pt. III, ch. 6, § 36, at 437 (1852). The General Assembly expanded the law seven years later by prohibiting a "druggist, apothecary, physician, or other person selling medicine" from selling any "medicine . . . known to be capable of producing abortion or miscarriage, with [the] intent to produce abortion." Act of Mar. 5, 1859, ch. LXXXI, § 2, 1859 Ind. Acts 130, 131. About twenty years after that, in 1881, the General Assembly raised the offense of providing an abortion from a misdemeanor to a felony and made it a misdemeanor for a pregnant woman or anyone aiding her to solicit an abortion. Act of Apr. 14, 1881, ch. XXXVII, §§ 22, 23, 1881 Ind. Acts 174, 177. In 1905, the legislature enacted a new criminal code and incorporated the 1881 statute. Act of Mar. 10, 1905, ch. 169, §§ 367, 368, 1905 Ind. Acts 584, 663–64.

There were many abortion cases early in our Court's history evaluating the propriety of indictments and convictions under the abortion statutes, *see, e.g.*, *State v. Vawter*, 7 Blackf. 592, 592 (1845), but none of the defendants argued the General Assembly exceeded its authority under the Indiana Constitution or the Federal Constitution by criminalizing abortion. The first time our Court heard such a claim was in 1972 when we considered an appeal under the Federal Constitution. We concluded in

*Cheaney v. State* that there was no federal constitutional right precluding the State from enacting its law prohibiting abortion except when necessary to protect a woman's life. 259 Ind. 138, 285 N.E.2d 265, 271–72 (1972). But a year later, the United States Supreme Court reached the opposite conclusion in *Roe v. Wade*, recognizing a qualified federal constitutional right to abortion: during the first trimester, states could not restrict abortion at all; during the second trimester, they could regulate, but not prohibit, abortion, and then only to protect maternal health; and during the third trimester, they could prohibit abortion except when it was necessary to protect a woman's life or health. 410 U.S. 113, 164–65, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973).

Mindful that the Federal Constitution trumps state law, and the United States Supreme Court's interpretation of the Federal Constitution trumps our interpretation of that document, our General Assembly reformed Indiana's abortion laws. But it did so under protest, explaining it revised the abortion laws only to comply with "recent Supreme Court decisions," Pub. L. No. 322, § 1, 1973 Ind. Acts 1740, 1741, and disclaiming any "constitutional right to abortion on demand" or approval of "abortion, except to save the life of the mother," *id.* at 1740. The legislature also continued to prohibit any abortions that federal law did not require to be permitted. *Id.* § 2, 1973 Ind. Acts at 1743–44.

Then, in 1992, the United States Supreme Court revisited *Roe*. While reaffirming *Roe*'s central holding that a woman has a federal constitutional right to terminate a pregnancy before fetal viability, the Court abandoned the "rigid prohibition on all previability regulation aimed at the protection of fetal life" because the trimester "formulation . . . misconceives the nature of the pregnant woman's interest" and "it undervalues the State's interest in potential life." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 873, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992). Replacing the rigid trimester framework was a new "undue burden" test. *Id.* at 878. After *Casey*, women had a federal constitutional right to abortion without undue interference from states before viability, but states could prohibit abortions after viability (so long as there was an exception for pregnancies which endangered a woman's health or life), and states had a legitimate interest in protecting both women's health and prenatal life from the

outset of pregnancy. *Id.* at 834. Again, Indiana reformed its laws to permit abortion only to the extent the United States Supreme Court required. Pub. L. No. 187-1995, 1995 Ind. Acts 3327, 3327–29.

Now, the United States Supreme Court has embraced the view of our predecessors in *Cheaney* and abandoned *Roe* and *Casey* altogether, overturning these precedents and deciding to "return" the authority to regulate or prohibit abortion "to the people and their elected representatives" in each state. *Dobbs,* 142 S. Ct. at 2284. Indiana's executive and legislative branches immediately seized that opportunity. During a special legislative session last summer, the General Assembly passed and the Governor signed Senate Bill 1, which prohibits abortion with three exceptions: when abortion is necessary either to prevent any serious health risk or to save a woman's life; when there is a lethal fetal anomaly; or when pregnancy results from rape or incest. Ind. Code § 16-34-2-1(a).

## II. Procedural History

A couple of weeks before Senate Bill 1 went into effect on September 15, 2022, the plaintiffs—Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc.; Women's Med Group Professional Corporation; All-Options, Inc.; and Amy Caldwell, M.D. (collectively, "Plaintiffs")—filed a complaint for declaratory and injunctive relief against Members of the Medical Licensing Board of Indiana, the Hendricks County Prosecutor, the Lake County Prosecutor, the Marion County Prosecutor, the Monroe County Prosecutor, the St. Joseph County Prosecutor, the Tippecanoe County Prosecutor, and the Warrick County Prosecutor (collectively, the "State"). That same day, Plaintiffs moved for a preliminary injunction to enjoin enforcement of Senate Bill 1, arguing the law violated Article 1, Sections 1, 12, and 23 of the Indiana Constitution. A little over a week later, Plaintiffs moved for a temporary restraining order, which the trial court denied, allowing the law to go into effect.

The trial court then held a hearing on Plaintiffs' motion for a preliminary injunction. After the hearing, the trial court issued a detailed, thoughtful order on September 22. The court found that Plaintiffs were "unlikely to prevail on the merits of their" Article 1, Section 23 claim,

which asserted that Senate Bill 1's hospital requirements for performing abortions discriminated against abortion providers in violation of the Equal Privileges and Immunities Clause. Appellants' App. Vol. II at 39. The court also recognized that, during the hearing, Plaintiffs withdrew their Article 1, Section 12 claim that the law's health and life exceptions are unconstitutionally vague. But, based on Plaintiffs' Article 1, Section 1 claim, the court enjoined enforcement of Senate Bill 1, which had then been in effect for seven days, "pending trial on the merits." *Id.* at 42.

For that claim, the trial court first found that Article 1, Section 1 "provides judicially enforceable rights." *Id.* And the court then concluded that Plaintiffs established a reasonable likelihood of success on the merits of their claim. In reaching that conclusion, the court found "a reasonable likelihood that decisions about family planning, including decisions about whether to carry a pregnancy to term[,] are included" within Section 1's protections. *Id.* at 37. The court also found that Plaintiffs satisfied the other requirements for preliminary injunctive relief and granted the preliminary injunction.

The State exercised its right to appeal the injunction immediately rather than waiting for a final judgment, *see* Ind. Appellate Rule 14(A)(5), and we accepted appellate jurisdiction under Appellate Rule 56(A).

## Standard of Review

The resolution of this appeal hinges on the trial court's conclusion that Plaintiffs satisfied the first requirement for a preliminary injunction: movants must establish by a preponderance of the evidence a reasonable likelihood of success on the merits of their claim. *See, e.g., Leone v. Comm'r, Ind. Bureau of Motor Vehicles*, 933 N.E.2d 1244, 1248 (Ind. 2010). It is well settled that the grant of a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether the court abused that discretion. *Apple Glen Crossing, LLC v. Trademark Retail, Inc.*, 784 N.E.2d 484, 487 (Ind. 2003). One way a trial court abuses its discretion is by misinterpreting the law. *State v. Econ. Freedom Fund*, 959 N.E.2d 794, 800 (Ind. 2011). And to the extent our analysis of the reasonable-

likelihood-of-success requirement turns on the trial court's interpretation of purely legal issues, we review those issues de novo. *See Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150, 152 (Ind. 2019).[2]

# Discussion and Decision

Article 1, Section 1 of the Indiana Constitution declares that all Hoosiers have "certain inalienable rights" which include "life, liberty, and the pursuit of happiness." Ind. Const. art. 1, § 1. Plaintiffs contend Senate Bill 1 is properly enjoined because the trial court correctly concluded they have established a reasonable likelihood of success on the merits of their claim that Section 1 "confers liberty rights that guarantee Hoosiers' ability to determine whether to carry a pregnancy to term." Appellees' Br. at 32. The State advances three main arguments on appeal: Plaintiffs lack standing; even if they have standing, Section 1 is not judicially enforceable; and even if Section 1 is judicially enforceable, it does not protect the abortion right Plaintiffs describe.

We first hold that Plaintiffs have standing because almost all of them are abortion providers, and it is undisputed that Senate Bill 1 criminalizes their work. Then, after evaluating Article 1, Section 1's text, history, structure, and purpose, we conclude that we should adhere to our precedents recognizing that the provision is judicially enforceable. Finally, we hold that Plaintiffs have not shown a reasonable likelihood of success on their facial challenge to Senate Bill 1, which requires them to prove there are no circumstances in which the law can be enforced consistent with Article 1, Section 1. While Section 1 protects a woman's right to an abortion that is necessary to protect her life or to protect her from a serious health risk, the provision does not protect a fundamental right to abortion in all circumstances. And it is undisputed that protecting

---

[2] We are grateful for the many amici briefs which were submitted to aid the Court in considering the important issues before us.

prenatal life falls within the State's broad authority under Article 1, Section 1 to protect the public's health, welfare, and safety.

Because Senate Bill 1 can be enforced consistent with Article 1, Section 1, we vacate the preliminary injunction without prejudice to future, narrower, facial or as-applied challenges.[3]

# I. Plaintiffs have standing.

Plaintiffs, almost all of which are abortion providers, asked the trial court to enjoin Senate Bill 1 because the law subjects them to criminal and regulatory penalties for assisting their patients with what Plaintiffs contend is a constitutionally protected liberty to terminate a pregnancy. As a threshold matter, the State argues Plaintiffs lack standing to make this claim because they are seeking to vindicate their patients' constitutional rights rather than their own. We disagree.

Standing is a doctrine deriving from our constitutional separation of powers. Under our tripartite system of government, the judicial branch is limited to exercising the "judicial power" of resolving "real issues through vigorous litigation." *Horner v. Curry*, 125 N.E.3d 584, 589 (Ind. 2019); *see also* Ind. Const. art. 7, § 1 (assigning the "judicial power"). To ensure courts resolve only "real issues" rather than engage in "academic debate or mere abstract speculation," *Horner*, 125 N.E.2d at 589, we require plaintiffs to show they have "standing" to present the contested issue and to invoke a court's adjudicative power. That means they must demonstrate "a personal stake in the outcome of the litigation" and that they have suffered, or are in imminent danger of suffering, "a direct injury as a result of the complained-of conduct." *Solarize Ind., Inc. v. S. Ind. Gas & Elec. Co.*, 182 N.E.3d 212, 217 (Ind. 2022) (quotations omitted); *see also Holcomb v. Bray*, 187 N.E.3d 1268, 1286 (Ind. 2022) ("An injury must be personal, direct, and one the plaintiff has suffered or is in imminent

---

[3] Because we agree with the State that Plaintiffs' facial challenge to the constitutionality of Senate Bill 1 fails, it is unnecessary to reach the State's argument that the trial court improperly weighed the preliminary injunction factors.

danger of suffering."). These requirements apply when a plaintiff seeks to invoke a court's authority to determine the constitutionality of a statute. *See, e.g., Gross v. State*, 506 N.E.2d 17, 21 (Ind. 1987).

Because "[c]onstitutional rights are personal," a plaintiff generally lacks standing to contest state action that results in only a "violation of a third party's constitutional rights." *Adler v. State*, 248 Ind. 193, 225 N.E.2d 171, 172 (1967). But if a statute's enforcement imminently threatens a plaintiff with their own direct injury, they have standing to challenge the statute's constitutionality, even if their claim is that the statute is invalid because it violates the rights of third parties. *See generally* 5 Ind. Law Encyc. Constitutional Law § 22 ("As a general rule, in criminal prosecutions, the accused has the right to question the constitutionality of the law under which he or she is being prosecuted."). Here, Plaintiffs are suing to enjoin Senate Bill 1 not just because they believe it infringes on their patients' constitutional rights, but also because, if enforced, it places them in immediate danger of sustaining their own direct injury from criminal prosecution or regulatory enforcement. That is enough for standing, and our Court has repeatedly reviewed the constitutionality of abortion laws based on abortion providers' claims that the laws are unconstitutional because they violate their patients' rights. *See Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 975 (Ind. 2005); *Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247, 248–49 (Ind. 2003); *A Woman's Choice-E. Side Women's Clinic v. Newman*, 671 N.E.2d 104, 106–07 (Ind. 1996); *Cheaney v. State*, 259 Ind. 138, 285 N.E.2d 265, 266 (1972).[4]

Secure in our jurisdiction, we turn to whether Article 1, Section 1 includes judicially enforceable rights and, if so, whether Plaintiffs have shown a reasonable likelihood of success on the merits of their claim that there are no circumstances in which the State can enforce Senate Bill 1

---

[4] Because we find that the abortion providers have standing, we do not consider the standing of the remaining plaintiffs. *Penn-Harris-Madison Sch. Corp. v. Joy*, 768 N.E.2d 940, 945 n.4 (Ind. Ct. App. 2002).

consistent with the Indiana Constitution.

## II. Article 1, Section 1 is judicially enforceable.

The State argues Plaintiffs' Article 1, Section 1 claim fails because, unlike the other provisions in Indiana's Bill of Rights, Section 1 is not judicially enforceable. All Section 1 does, the State says, is merely express "a basic philosophy of government and the relationship between the individual and the State, but it does not include specific protections against governmental overreach." Appellants' Br. at 35. We disagree. Our review of Section 1's text, history, structure, and purpose, as well as the case law interpreting it, leads us to conclude (A) Section 1 is a Lockean Natural Rights Guarantee securing fundamental rights and limiting governmental authority to the police power, and (B) the provision is judicially enforceable.

### A. Section 1 is a Lockean Natural Rights Guarantee.

Interpreting Article 1, Section 1 requires us to uncover "the common understanding of both those who framed" our Constitution "and those who ratified it." *Paul Stieler Enters., Inc. v. City of Evansville*, 2 N.E.3d 1269, 1272–73 (Ind. 2014) (quotations omitted). We find that common understanding by examining "the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions." *Id.* at 1273 (quotations omitted). As with every provision in the Constitution, we treat Section 1 with "particular deference, as though every word had been hammered into place." *Meredith v. Pence*, 984 N.E.2d 1213, 1218 (Ind. 2013) (quotations omitted).

Article 1, Section 1 states in full:

> WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments

are, and of right ought to be, founded on their authority, and
instituted for their peace, safety, and well-being. For the
advancement of these ends, the people have, at all times, an
indefeasible right to alter and reform their government.

Ind. Const. art. 1, § 1.

The first state constitutional document to include this set of guarantees
was the Virginia Declaration of Rights in 1776, which was the first bill of
rights adopted through a popularly elected convention. Steven G.
Calabresi & Sofía M. Vickery, *On Liberty and the Fourteenth Amendment: The
Original Understanding of the Lockean Natural Rights Guarantees*, 93 Tex. L.
Rev. 1299, 1313–14 (2015). A month after Virginia adopted its Declaration
of Rights, Pennsylvania adopted a similar provision in its constitution. *Id.*
at 1317–18. Around the same time, Thomas Jefferson used the Virginia
provision as a model for expressing these same ideas in the Declaration of
Independence. *Id.* at 1318–19.

These provisions, known as "Lockean Natural Rights Guarantees,"
quickly became standard in state constitutions, and they are generally
understood as constitutionalizing the social contract theory of the English
political philosopher John Locke. *Id.* at 1303–04. Locke believed that before
forming a civil society we were in a state of nature where we all had equal
freedom to do as we pleased so long as we did not "take away or impair
the life, or what tends to the preservation of life, the liberty, health, limb,
or goods of another." John Locke, *Two Treatises of Government and A Letter
Concerning Toleration* 102 (Ian Shapiro ed., Yale Univ. Press 2003) (1690).
That freedom included natural rights: "every [person] has a property in
[their] own person," the "labour of [their] body," and "the work of [their]
hands." *Id.* at 111. But we left the state of nature and entered a civil
society, giving up some of our natural rights in exchange for better
protection of the remaining natural rights and for the enjoyment of new
positive rights (e.g., the right to a jury trial). *See generally* Michael W.
McConnell, *Natural Rights and the Ninth Amendment: How Does Lockean
Legal Theory Assist in Interpretation?*, 5 N.Y.U. J.L. & Liberty 1, 11 (2010); *see
also Price v. State*, 622 N.E.2d 954, 959 (Ind. 1993) ("Under [the natural
rights] theory, individuals are deemed to have ceded a quantum of their

'natural' rights in exchange for 'receiving the advantages of mutual commerce.'" (footnote omitted) (quoting Sir William Blackstone, *Commentaries on the Laws of England* I:125 (Thomas M. Cooley ed., 3d ed. 1884))).

The only reason for giving up some natural rights is to better secure the remainder, so citizens do not relinquish natural rights beyond what is reasonably necessary to secure the natural rights of the broader community. Locke, *supra*, at 156–57; *see also Whittington v. State*, 669 N.E.2d 1363, 1368 (Ind. 1996) ("The purpose of state power, then, is to foster an atmosphere in which individuals can fully enjoy that measure of freedom they have not delegated to government."). For that reason, civil laws can "be directed to no other end but the peace, safety, and public good of the people," Locke, *supra*, at 157,[5] or what we call the "police power." As George Mason, the author of the first Lockean Natural Rights Guarantee, explained:

> To protect the weaker from the injuries and insults of the stronger were societies first formed; when men entered into compacts to give up some of their natural rights, that by union and mutual assistance they might secure the rest; but they gave up no more than the nature of the thing required. Every society, all government, and every kind of civil compact therefore, is or ought to be, calculated for the general good and safety of the community. Every power, every authority vested in particular men is, or ought to be, ultimately directed to this sole end; and whenever any power or authority whatever extends further, or is of longer duration than is in its nature necessary for these

---

[5] *See also Price v. State*, 622 N.E.2d 954, 959 (Ind. 1993) ("This right of the majority to define and effect salubrious conditions is sometimes viewed as being at odds with the ability of individuals to pursue their personal ends. Our founders, however, perceived no dichotomy between individual rights and communal needs. Instead, they viewed the needs which gave rise to state powers as impediments to the full enjoyment of rights. State powers were thus intended to perform an ameliorative function and were considered liberty-enhancing when exercised by a properly structured republican government." (citations omitted)).

> purposes, it may be called government, but it is in fact oppression.

Calabresi & Vickery, *supra*, at 1314 (quoting George Mason, Remarks on Annual Elections for the Fairfax Independent Company (Apr. 17–26, 1775), *in* 1 Papers of George Mason 229–30 (Rutland ed., 1970)).

Article 1, Section 1 implements this theory for our State, and it protects Hoosiers' rights in at least two key respects.

First, it guarantees certain fundamental rights. Those of course include rights listed throughout our Constitution, including Indiana's Bill of Rights. *Price*, 622 N.E.2d at 959 n.4. But the "individual guarantees in our Bill of Rights merely help to highlight some of the particular contours of the state power as it has generally been delegated." *Whittington*, 669 N.E.2d at 1369 n.6. They "describe with greater particularity some of the personal freedoms the restriction of which would not, in the framers' view, tend to advance those permissible state goals." *Zoeller v. Sweeney*, 19 N.E.3d 749, 753 (Ind. 2014) (emphasis omitted) (quotations omitted) (also explaining that the guarantees throughout the rest of the Bill of Rights "are but concrete manifestations" of fundamental rights).

Article 1, Section 1's fundamental rights also include unenumerated rights under the umbrella of "life, liberty, and the pursuit of happiness." Ind. Const. art. 1, § 1; *see Price*, 622 N.E.2d at 959 n.4 (explaining that fundamental rights include "those which have their origin in the express terms of the constitution *or which are necessarily to be implied from those terms*" (emphasis added) (quotations omitted)). Those rights protect any interest "of such a quality that the founding generation would have considered it fundamental or 'natural'"—in other words, beyond the reach of government. *Price*, 622 N.E.2d at 959 n.4. It is impossible to catalogue Section 1's implicit fundamental rights, but a few examples include

having and raising children,[6] pursuing a vocation that does not harm others,[7] and patient self-determination.[8]

Of course, the precise contours of all rights, including unenumerated rights, must be established through individual cases in which each right is described with the appropriate level of particularity to consider whether the founding generation would have considered the right fundamental. And "[a]s a matter of state constitutional law, Indiana courts have used a number of different standards of review, depending upon the particular constitutional right alleged to be infringed and the magnitude of it." *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 982 (Ind. 2005).

Second, Article 1, Section 1 limits governmental authority to the police power. Unlike the Federal Constitution, our Indiana Constitution does not "establish a system of expressly enumerated powers." *Whittington*, 669 N.E.2d at 1369 n.6. Instead, "power is generally vested in the legislature, and the outer boundary of that general power is marked by the requirement that it be exercised to advance 'peace, safety, and well-being.'" *Id.* (cleaned up).[9]

---

[6] *See State v. Alcorn*, 638 N.E.2d 1242, 1245 (Ind. 1994) (recognizing a fundamental right to "procreation"); *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016) (recognizing that "a parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests" (cleaned up)).

[7] *Kirtley v. State*, 227 Ind. 175, 84 N.E.2d 712, 714 (1949) ("However, the personal liberty clause, Art. 1, § 1 of the Constitution of Indiana, or the right to pursue any proper vocation, is regarded as an unalienable right and a privilege not to be restricted except perhaps by a proper exercise of the police power of the state."); *In re Leach*, 134 Ind. 665, 34 N.E. 641, 642 (1893) ("Before the law this right to a choice of avocations cannot be said to be denied, or intended to be abridged, on account of sex. Certainly the framers of our constitution intended no such result, and surely the legislature entertained no such purpose. Instead of such results having been intended in this state, we find the constitution declaring that such rights are inalienable." (citing Ind. Const. art. 1, § 1)).

[8] *See In re Lawrance*, 579 N.E.2d 32, 39 (Ind. 1991) ("Like the common law and our constitution, Indiana's statutes reflect a commitment to patient self-determination.").

[9] *See generally* Monrad Paulsen, *"Natural Rights"-- A Constitutional Doctrine in Indiana*, 25 Ind. L.J. 123, 143 (1950) (explaining that "[t]he guarantee of natural rights, curtailed only to the extent which the promotion of the public peace, safety, health or welfare requires, has become the basic doctrine of Indiana constitutional law").

When evaluating whether state action is an appropriate exercise of the police power, we "confine [ourselves] to the question, not of legislative policy, but of legislative power." *Dep't of Fin. Insts. v. Holt*, 231 Ind. 293, 108 N.E.2d 629, 634 (1952). To fall within the police power, a "law must not be arbitrary, unreasonable or patently beyond the necessities of the case." *Id.* "If the law prohibits that which is harmless in itself, or if it is unreasonable and purely arbitrary, or requires that to be done which does not tend to promote" the police power, "it is an unauthorized exercise of power." *Id.* So, for example, we have held the General Assembly cannot prohibit people from advertising their lawful business, *Needham v. Proffitt*, 220 Ind. 265, 41 N.E.2d 606, 608 (1942), or require insurance agents to work on commission rather than salary, *Dep't of Ins. v. Schoonover*, 225 Ind. 187, 72 N.E.2d 747, 750 (1947), because those restrictions were not rationally related to protecting the public's peace, safety, and well-being. In contrast, the General Assembly may impose professional licensure requirements when they are rationally related to protecting consumers even though such laws may limit someone's ability to profit off their labor. *See Ice v. State ex rel. Ind. State Bd. of Dental Exam'rs*, 240 Ind. 82, 161 N.E.2d 171, 173–75 (1959).

There is symmetry here. While the State worries judicial enforcement of unenumerated rights may overreach, most of the State's police powers are unenumerated too, so there should be equal concern that the State might view its own powers too generously. After all, our Constitution's language in delegating authority to the State for promoting the "peace, safety, and well-being" of Hoosiers is no less capacious than its language guaranteeing Hoosiers' rights to "life, liberty, and the pursuit of happiness." Ind. Const. art. 1, § 1. So, Article 1, Section 1 strikes a balance: it allows the State broad authority to promote the peace, safety, and well-being of Hoosiers, but that authority goes no farther than reasonably necessary to advance the police power, and not at the expense of alienating what Hoosiers have commonly understood to be certain fundamental rights.

## B. Section 1 is judicially enforceable.

Roughly forty state constitutions now contain Lockean Natural Rights Guarantees, and courts in most of those states have concluded the clauses are judicially enforceable. Joseph R. Grodin, *Rediscovering the State Constitutional Right to Happiness and Safety*, 25 Hastings Const. L.Q. 1, 1, 22 (1997). Several state supreme courts have recently analyzed their analogous provisions in addressing claims like the one before us today, and they all concluded those provisions are judicially enforceable. *Okla. Call for Reprod. Just.*, 526 P.3d 1123, 1130 (Okla. 2023); *Wrigley v. Romanick*, 988 N.W.2d 231, 240 (N.D. 2023); *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1167–95 (Idaho 2023); *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 471 (Kan. 2019). We reach the same conclusion based on our review of Section's 1 text, "illuminated by history and by the purpose and structure of our constitution and the case law surrounding it." *Price*, 622 N.E.2d at 957.

### 1. Text

We start with the text. Section 1 says Hoosiers "declare" they have retained certain inalienable rights related to life, liberty, and the pursuit of happiness and that the government is restrained to pursuing only their peace, safety, and well-being. Ind. Const. art. 1, § 1. The State reads the word "declare" as a clue that the framers did not mean to give the courts a role in enforcing Section 1 because the remaining provisions of the Bill of Rights (and many other constitutional provisions, for that matter) use the word "shall" instead of "declare" when conveying specific and mandatory direction. Because Section 1 does not use the word "shall," the State reads what Section 1 "declare[s]" as mere "sweeping declarations of fundamental truths," not enforceable limits on government power. Appellants' Br. at 37. We read the text differently.

While the framers typically used the word "shall" for specific, mandatory direction, there are other times outside Section 1 when they used the word "declare." They required that "[e]very statute shall be a public law[]" unless "otherwise declared in the statute itself." Ind. Const. art. 4, § 27. Additionally, legislative acts can take effect before publication

in the counties if an emergency is "declared" in the statute's preamble. *Id.* § 28. And just as Section 1 declares the legal boundaries of government power, Article 14 "declare[s]" the State's geographic boundaries. Ind. Const. art. 14, § 1.

In any event, even when constitutions "declare" fundamental truths about the government, that does not mean the declarations cannot be judicially enforced. One example is separation-of-powers provisions. James Madison referred to those provisions as identifying "dogmatic maxims with respect to the construction of the Government; declaring that the legislative, executive, and judicial branches shall be kept separate and distinct." 1 Annals of Cong. 454 (1789) (Joseph Gales ed., 1834). He placed less faith in these dogmatic maxims than he did in a constitutional architecture that incorporated "checks" to "prevent the encroachment of . . . one [branch of government] upon the other." *Id.*

But the fact that Madison placed more faith in the separate branches jealously guarding their powers than he did in constitutional separation-of-powers provisions does not mean those provisions had no teeth. To the contrary, even though our own Constitution's separation-of-powers provision conveys the typical dogmatic maxim relating to the structure of government, Ind. Const. art. 3, § 1, we routinely enforce the provision, *see, e.g., Holcomb v. Bray*, 187 N.E.3d 1268, 1276 (Ind. 2022). Thus, the fact that Section 1 "declares" inalienable rights does not render the provision unenforceable.

### 2. Changes from the 1816 Constitution to the 1851 Constitution

The history and evolution of Article 1, Section 1 reveal it has always been understood to be enforceable. The 1816 Constitution had an analog to Section 1, but it was spread over two sections:

> Sect. 1st. That the general, great and essential principles of liberty and free Government may be recognized and unalterably established; WE declare, That all men are born equally free and independent, and have certain natural, inherent, and

unalienable rights; among which are the enjoying and defending life and liberty, and of acquiring, possessing, and protecting property, and pursuing and obtaining happiness and safety.

Sect. 2. That all power is inherent in the people; and all free Governments are founded on their authority, and instituted for their peace, safety and happiness. For the advancement of these ends, they have at all times an unalienable and indefeasible right to alter or reform their Government in such manner as they may think proper.

Ind. Const. of 1816 art. I, §§ 1–2.

During the 1850–51 Constitutional Convention, the framers ultimately combined these two provisions into one—but not before fervent debate. Delegate Owen, for example, questioned whether, given the Declaration of Independence, an inalienable-rights provision was necessary, noting that "in the constitutions of several of the States it is wholly omitted." 1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 958 (1850). Though he was not alone in this view, *id.* at 966–67, 970–71, other delegates vehemently disagreed.

Delegate Kinley, for example, implored that an inalienable-rights clause "should occupy a prominent place in the Constitution of a free people." *Id.* at 964. He presciently recognized that "this grave political idea that all men possess the same inherent rights, is a truth too far in advance of the age, a truth which time will appreciate, a truth which, in practice as well as in theory, the world will ultimately adopt." *Id.* (emphasis omitted). Delegate Howe similarly expressed, "[I]t is a great fundamental truth, that lies at the foundation of all human governments, that men possess these inherent and inalienable rights." *Id.* at 972. And he later stated, "There is no means by which you can have a government of true liberty, unless you can restrict the sovereign power." *Id.* at 974. Delegate Dunn likewise believed that "the very object of a Constitution is to protect the minority in the enjoyment of their rights—to put a restraint upon the hot blood and the strong arm of the majority. And unless this restraint is employed in [the Constitution], you leave unrestricted a power which history proves is

peculiarly liable to abuse." *Id.* at 956. He thus wanted to "give . . . this sentiment the first place in our bill of rights, that our children and our children's children may early learn it, and cherish it in their hearts as one of the fundamental principles of our government." *Id.* at 957.

Ultimately, these voices won the day, and the provision was referred to the committee on revision, arrangement, and phraseology. *Id.* at 974. The finalized, ratified version combined Sections 1 and 2 of the 1816 Constitution into Article 1, Section 1. But combining the two sections was not intended to change the meaning or enforceability of the Lockean Natural Rights Guarantee. *See* Monrad Paulsen, *"Natural Rights" -- A Constitutional Doctrine in Indiana*, 25 Ind. L.J. 123, 128 (1950) (explaining that the rewording in the 1851 provision was not meant to change the meaning); John D. Barnhart & Donald F. Carmony, *Indiana's Century Old Constitution* 12 (1951) ("The sections which define and protect the fundamental liberties and rights of the citizens were rearranged and restated in the new document, but there was little that was significantly different."). It thus makes no difference that Section 1 in our current Constitution retains the word "declare" rather than omitting that word as the second section in the 1816 Constitution did. Combining the two sections also aligned with the Madisonian view that protecting fundamental rights and limiting government power were two sides of the same coin. *See* Letter from James Madison to George Washington (Dec. 5, 1789), *in* 4 Papers of George Washington: Presidential Series 367–69 (D. Twohig ed., 1993); *see also* Randy E. Barnett, *The Proper Scope of the Police Power*, 79 Notre Dame L. Rev. 429, 483 (2004) ("In this way, Lockean theory provides both a powerful rationale for and an important limit upon the powers of government that is reflected in the police power doctrine. The police power is the legitimate authority of states to regulate rightful and prohibit wrongful acts.").

Indiana's decision to retain its Lockean Natural Rights Guarantee adhered to the approach of all the other states which had those provisions at the time. *See* Calabresi & Vickery, *supra*, at 1323 ("We are not aware of any instance of a state convention permanently removing a Lockean Natural Rights Guarantee from its constitutional text between the Founding and 1868."). And the above history reflects that our framers and

ratifiers likewise understood that Article 1, Section 1 would be judicially enforceable.

### 3. Structure and Purpose

Our understanding that Section 1 is judicially enforceable also aligns with our Constitution's structure and purpose. Our Constitution has a preamble, but its framers—more than one-third of whom had legal training[10]—did not include the Lockean Natural Rights Guarantee there. Instead, and unlike the Federal Constitution, they made it the first section in our Bill of Rights. Placing the Guarantee in the Bill of Rights rather than a preamble suggests the framers and ratifiers intended to make the provision judicially enforceable along with the rest of the Bill of Rights. And considering that the "principal task" of the Constitution is to constitutionalize the Lockean theory of government, *Price*, 622 N.E.2d at 959, it is no surprise that this is the first provision providing context for those that follow. *See* Barnhart & Carmony, *supra*, at 12.

The State, however, worries that reading Section 1 as judicially enforceable will "wreak havoc on the constitutional structure" because it "would permit litigants to circumvent the framers' deliberate choices about which rights to include in Article 1 and how to frame them," allowing litigants to evade the limits of other provisions in the Bill of Rights by simply invoking Section 1's "capacious reference to 'life, liberty, and the pursuit of happiness.'" Appellants' Br. at 37. But the State has things backwards.

The more particular guarantees of liberty throughout the Bill of Rights "are but concrete manifestations" of Article 1's more general limiting principle that state power is limited to the police power and that Hoosiers have retained certain fundamental rights. *Zoeller*, 19 N.E.3d at 753 (quotations omitted). Contrary to the State's framing, the "Indiana

---

[10] Hon. Brent E. Dickson, Thomas A. John, & Katherine A. Wyman, *Lawyers and Judges as Framers of Indiana's 1851 Constitution*, 30 Ind. L. Rev. 397, 397 (1997).

Constitution does not grant government an absolute, limitless state power and then withdraw discrete portions of it by specific excision." *Whittington*, 669 N.E.2d at 1369 n.6. So the structure and purpose of our Constitution bolster our conclusion that Article 1, Section 1 is judicially enforceable.

### 4. Case law

A review of our case law applying Article 1, Section 1 leads to the same conclusion. We first relied on the 1816 version of Section 1 to hold that the Constitution prohibited slavery even in situations not contemplated in the more specific anti-slavery provisions provided elsewhere in the document, such as when Polly Strong, a woman enslaved before the State existed, had to be freed. *State v. Lasselle*, 1 Blackf. 60, 62 (1820). After considering "elaborate research into the origin of our rights and privileges, and their progress until the formation of our State government, in 1816," we revealed no hesitation in relying on Section 1 to free Strong. *Id.* at 61; *see also* Hon. Loretta H. Rush & Marie Forney Miller, *Cultivating State Constitutional Law to Form a More Perfect Union--Indiana's Story*, 33 Notre Dame J.L. Ethics & Pub. Pol'y 377, 382 (2019) (explaining that Section 1 "contributed to the Indiana Supreme Court's holding in Polly Strong's case that the state constitution prohibits slavery in Indiana"); Calabresi & Vickery, *supra*, at 1338 (explaining that our Court identified Section 1 as "critical textual support for holding that slavery was unconstitutional even where the slave had been purchased prior to the existence of the state").

Then, starting just a few years after Section 1 was folded into the 1851 Constitution—and continuing in the following decades—we invalidated many statutes based on the provision. Those statutes included a liquor control act, *Herman v. State*, 8 Ind. 545, 556–58 (1855); *Beebe v. State*, 6 Ind. 501, 510, 522 (1855), *overruled on other grounds by Schmitt v. F. W. Cook*

*Brewing Co.*, 187 Ind. 623, 120 N.E. 19, 21 (1918);[11] a statute requiring the weekly payment of wages, *Republic Iron & Steel Co. v. State*, 160 Ind. 379, 66 N.E. 1005, 1009 (1903); a minimum wage law, *Street v. Varney Elec. Supply Co.*, 160 Ind. 338, 66 N.E. 895, 896 (1903); a statute calling for a constitutional convention, *Bennett v. Jackson*, 186 Ind. 533, 116 N.E. 921, 923 (1917); a statute prohibiting a licensed funeral director and embalmer from advertising his services to the public in newspapers, *Needham*, 41 N.E.2d at 607; a statute fixing a county's minimum prices that barbers could charge for their services and the barbers' hours of operation, *State Bd. of Barber Exam'rs v. Cloud*, 220 Ind. 552, 44 N.E.2d 972, 980–81 (1942); a statute allowing only insurance agents who work on commission to sell fire and casualty insurance, *Schoonover*, 72 N.E.2d at 750; a statute prohibiting ticket scalping, *Kirtley v. State*, 227 Ind. 175, 84 N.E.2d 712, 715 (1949); an automobile dealer price-fixing statute, *Holt*, 108 N.E.2d at 633–37; and a statute permitting the Insurance Commissioner to refuse insurance licenses to those in the automobile business, *Dep't of Ins. v. Motors Ins. Corp.*, 236 Ind. 1, 138 N.E.2d 157, 165 (1956).

As the State points out, we later overruled or narrowed some of these precedents, *see, e.g.*, *Schmitt*, 120 N.E. at 21 (overruling our precedents invalidating liquor control acts), but only because we embraced a more expansive view of the police power, not because we concluded Section 1

---

[11] While Judge Perkins (members of our Court held the title "judge" rather than "justice" at the time) wrote the lead opinions in *Herman* and *Beebe*, he did not achieve a majority for his opinions in either case. Paulsen, *supra*, at 133. In 1858, after *Beebe* dissenters Judges Stuart and Gookins were replaced by Judges Worden and Hanna, the Court unanimously invalidated the liquor control act, although the new judges did not convey whether they agreed with Judge Perkins' constitutional analysis. *Id.*; *see also Howe v. State*, 10 Ind. 423, 423 (1858) (explaining that it was "the unanimous opinion of the Court" that the liquor law of 1855 was "unconstitutional and void"); *Ingersoll v. State*, 11 Ind. 464, 465 (1859) ("This law went into operation, was acted under, and was not judicially annulled till about three years had elapsed from the time of its going into force. It was not annulled by the decision in *Beebe v. State*, 6 Ind. 501. The Court, in that case, was equally divided upon the portion of the law inhibiting the retail of liquors, and left that portion of it in force, by the application of the same principle that had continued in operation the act of 1853, as above stated. The law was not annulled till the new Court came upon the bench, when, in the case of *Howe v. State*, 10 Ind. 423, decided on the 19th of June, 1858, the Court unanimously pronounced the law void.").

was unenforceable. And even when we have declined to invalidate statutes, we have often reviewed them for their compliance with Article 1, Section 1. *See, e.g.*, *Madison & Indianapolis R.R. Co. v. Whiteneck*, 8 Ind. 217, 227, 236 (1856); *Int'l Text-Book Co. v. Weissinger*, 160 Ind. 349, 65 N.E. 521, 522 (1902); *Cleveland, C., C. & St. L. Ry. Co. v. Marshall*, 182 Ind. 280, 105 N.E. 570, 571–72 (1914); *Weisenberger v. State*, 202 Ind. 424, 175 N.E. 238, 240–41 (1931); *Walgreen Co. v. Gross Income Tax Div.*, 225 Ind. 418, 75 N.E.2d 784, 788 (1947); *Johnson v. Burke*, 238 Ind. 1, 148 N.E.2d 413, 418 (1958); *State ex rel. Ind. Real Est. Comm'n v. Meier*, 244 Ind. 12, 190 N.E.2d 191, 195 (1963); *Bd. of Commr's of Howard Cnty. v. Kokomo City Plan Comm'n*, 263 Ind. 282, 330 N.E.2d 92, 100 (1975); *Whittington*, 669 N.E.2d at 1369; *Moore v. State*, 949 N.E.2d 343, 345 (Ind. 2011); *see also Brizzi*, 837 N.E.2d at 998 (Boehm, J., dissenting) (recognizing that our appellate courts have sustained legislation under Section 1 "on the ground that the law reflects a legitimate exercise of the 'police power' of the state, and not on the ground that there is no justiciable issue or that the right to life, liberty, and the pursuit of happiness has no content").

Granted, we have often evaluated a law's compliance with Article 1, Section 1 alongside claims under other provisions of our Bill of Rights. But not always. On at least four occasions throughout the twentieth century, we held that Section 1 was an independent basis for declaring a statute unconstitutional. *Bennett*, 116 N.E. at 923; *Schoonover*, 72 N.E.2d at 750; *Holt*, 108 N.E.2d at 633–37; *Ind. Dep't of Env't Mgmt. v. Chem. Waste Mgmt., Inc.*, 643 N.E.2d 331, 341 (Ind. 1994). Thus, our precedent has consistently recognized that Section 1 is judicially enforceable.

In sum, a review of Article 1, Section 1's text, changes made in the 1851 Constitution, our Constitution's structure and purpose, and case law applying the provision leads us to continue recognizing Section 1 as judicially enforceable. We now turn to the scope of Article 1, Section 1's protections as they relate to Senate Bill 1.

# III. Plaintiffs do not have a reasonable likelihood of success for their claim that Senate Bill 1 is facially invalid.

"A statute challenged under the Indiana Constitution stands before this Court clothed with the presumption of constitutionality until clearly overcome by a contrary showing." *Paul Stieler Enters., Inc. v. City of Evansville*, 2 N.E.3d 1269, 1273 (Ind. 2014) (quotations omitted). Plaintiffs challenge the constitutionality of Senate Bill 1 on its face rather than as applied to any particular set of facts, which means to obtain a preliminary injunction they needed to show they are reasonably likely to prove there are no circumstances in which Senate Bill 1 could ever be enforced consistent with Article 1, Section 1. *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind. 1999). A facial challenge to a statute is "the most difficult challenge to mount successfully," *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987), because if there is "at least one circumstance under which the statute can be constitutionally applied," the challenge fails, *Zoeller v. Sweeney*, 19 N.E.3d 749, 754 (Ind. 2014) (Rucker, J., concurring) (cleaned up).[12]

Evaluating Plaintiffs' claim requires us first to determine the common understanding of Section 1's protections among those who framed and ratified it in 1851, and then to determine the common understanding of the legislators and voters who agreed in 1984 to change the reference in Section 1 from "men" to "people." *Paul Stieler Enters., Inc.*, 2 N.E.3d at 1273. We conclude that while Section 1 precludes the General Assembly from prohibiting an abortion that is necessary to protect a woman's life or to protect her from a serious health risk, Section 1's protection of "liberty"

---

[12] A statute that is constitutional on its face may be unconstitutional when applied to a particular plaintiff. *Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247, 257 (Ind. 2003). "[U]nlike the higher burden faced by those making a facial constitutional challenge," those challenging the statute as applied "need only show the statute is unconstitutional on the facts of the particular case." *State v. S.T.*, 82 N.E.3d 257, 259 (Ind. 2017) (quotations omitted).

generally permits the General Assembly to prohibit abortions that do not fall within one of those categories. Plaintiffs therefore cannot demonstrate a reasonable likelihood of success on their facial challenge to Senate Bill 1, and the preliminary injunction must be vacated.

### A. Article 1, Section 1 protects a woman's right to an abortion that is necessary to protect her life or to protect her from a serious health risk.

Plaintiffs emphasize that abortion procedures are sometimes their only means to save their patients' lives. That is undisputed, and we agree the Constitution—including Article 1, Section 1—does not permit the General Assembly to prohibit abortion in those circumstances. But that is not a basis for enjoining the entirety of Senate Bill 1 in all circumstances, including when abortion is unnecessary to protect a woman's life or to protect her from a serious health risk.

Article 1, Section 1 expressly protects an "inalienable" right to "life," which was a firmly established right long before Indiana became a state. *See generally* Eugene Volokh, *State Constitutional Rights of Self-Defense and Defense of Property*, 11 Tex. Rev. L. & Pol. 399, 401–07 (2007). That right to protect one's own life extends beyond just protecting against imminent death, and it includes protecting against "great bodily harm." *Larkin v. State*, 173 N.E.3d 662, 670 (Ind. 2021). Although the State disputes that Article 1, Section 1 is judicially enforceable, it recognizes that governmental authority is limited to the police power, and it acknowledges "grave doubt" that the police power would permit the State to prohibit an abortion that was necessary to save a woman's life. Oral Argument at 17:22–17:37.

Because this fundamental right of self-protection—whether considered as an exercise of the right to life, an exercise of the right to liberty, a limitation on the scope of the police power, or as a matter of equal treatment—is so firmly rooted in Indiana's history and traditions, it is a relatively uncontroversial legal proposition that the General Assembly cannot prohibit an abortion procedure that is necessary to protect a

woman's life or to protect her from a serious health risk. *See, e.g., Dobbs v. Jackson Women's Health Org.*, 597 U.S. ----, 142 S. Ct. 2228, 2305 n.2, 213 L. Ed. 2d 545 (2022) (Kavanaugh, J., concurring) ("Abortion statutes traditionally and currently provide for an exception when an abortion is necessary to protect the life of the mother."); *see generally* Eugene Volokh, *Medical Self-Defense, Prohibited Experimental Therapies, and Payment for Organs*, 120 Harv. L. Rev. 1813, 1825 (2007) (demonstrating that, and explaining why, "the abortion-as-self-defense right is largely uncontroversial").

Reflecting that understanding, all of Indiana's abortion statutes since 1851 have recognized an exception for abortions that are required to protect a woman's life. Even when the General Assembly revised the abortion laws in response to *Roe* and made clear it was not agreeing there is "a constitutional right to abortion on demand" or that it "approves of abortion," it also made clear that it continued to conclude that abortion should remain available "to save the life of the mother." Pub. L. No. 322, § 1, 1973 Ind. Acts 1740, 1740. And now that the United States Supreme Court has returned broad discretion to the states to determine the legality of abortion, Senate Bill 1's general abortion ban continues to recognize an exception for "when reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life." Ind. Code § 16-34-2-1(a)(1)(A)(i); *see also id.* § -1(a)(3)(A).

Accordingly, Article 1, Section 1 protects a woman's right to an abortion that is necessary to protect her life or to protect her from a serious health risk. Yet, this holding does not support Plaintiffs' claim for a preliminary injunction. That is because they framed their claim as a facial challenge to the entire statute in all conceivable circumstances rather than an as-applied challenge to the law's application in any particular set of circumstances where a pregnancy endangers a woman's life or health. So this appeal does not present an opportunity to establish the precise contours of a constitutionally required life or health exception and the extent to which that exception may be broader than the current statutory exceptions. *Cf. Gonzales v. Carhart*, 550 U.S. 124, 167, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007) ("In an as-applied challenge the nature of the medical

risk can be better quantified and balanced than in a facial attack."). For purposes of this appeal, all we can say is that Senate Bill 1 is not facially invalid as interfering with a woman's access to care that is necessary to protect her life or health.[13]

To enjoin the statute as a whole in all circumstances, then, Plaintiffs had to show that Article 1, Section 1's protection of "liberty" establishes a woman's right to terminate a pregnancy in all circumstances, precluding the General Assembly from prohibiting any abortion. As we explain next, Article 1, Section 1, does not foreclose that legislative discretion.

## B. The General Assembly retains legislative discretion to prohibit abortions that are unnecessary to protect a woman's life or to protect her from a serious health risk.

Article 1, Section 1 protects a fundamental right to "liberty." Plaintiffs contend this covers "a bundle of liberty rights"—including unenumerated rights to privacy, bodily autonomy, and self-determination—which coalesce to protect a fundamental right to abortion up to the point in a pregnancy when a fetus would be viable outside the womb (around 23 or 24 weeks). Appellees' Br. at 31. In other words, Plaintiffs' claim depends on the Indiana Constitution protecting the same abortion right the United States Supreme Court recognized in *Roe* and *Casey* before recently overruling those decisions in *Dobbs*. We conclude that was not how Article 1, Section 1's framers and ratifiers understood the provision, and the 1984 amendment changing references throughout the Constitution to gender

---

[13] The dissent believes that by acknowledging the General Assembly cannot prohibit abortions that are necessary to protect a woman's life or to protect her from a serious health risk, we are "effectively inviting the legislature to repeal" the statutory exceptions for lethal fetal anomalies and pregnancies resulting from rape and incest. *Post*, at 16 (opinion of Goff, J.). We convey no such invitation, and we do not urge the General Assembly to pursue or decline any particular public policy approach. Plaintiffs invoked a woman's right to protect her own life and health as a basis for enjoining the law on its face. The statutory exceptions unrelated to a pregnant woman's life or health are not at issue for Plaintiffs' facial challenge, and the parties have not addressed whether our Constitution compels those exceptions, so we do not address those distinct questions.

neutral terms did not create a constitutionally protected abortion right
either.

### 1. The framers and ratifiers understood Article 1, Section 1 as generally leaving abortion within the General Assembly's broad legislative discretion.

Plaintiffs argue abortion is a fundamental right necessarily implied in the protection of liberty. To recognize an unenumerated, implied right, we must conclude the right is "of such a quality that the founding generation would have considered it fundamental or 'natural.'" *Price v. State*, 622 N.E.2d 954, 959 n.4 (Ind. 1993). That is because what gives our Constitution force is that it reflects an agreement reached through the constitutional framing, ratifying, and amendment processes. So we cannot supplant what the framers and ratifiers believed they were agreeing to with our own notions of which aspects of liberty ought to be off limits for the legislative process, or our notions of which aspects of liberty we suspect voters today might embrace as worthy of heightened constitutional protections if asked. This also means we do not analyze whether liberty, privacy, autonomy, self-determination, and abortion relate to each other in a colloquial sense. Rather, our task is to discern the contours of constitutionally protected liberty as Section 1's framers and ratifiers understood them, and then to decide whether that common understanding of liberty leaves the General Assembly discretion to generally prohibit abortions that are unnecessary to protect a woman's life or health.

Indiana's long history of generally prohibiting abortion as a criminal act—coupled with Plaintiffs' acknowledgment that protecting prenatal life falls within the State's broad authority to protect the public's health, welfare, and safety—suggests that the common understanding among Article 1, Section 1's framers and ratifiers was that the provision left the General Assembly with legislative discretion to regulate or limit abortion. Even before statehood, Indiana's territorial law prohibited abortions after quickening, and for the entire period between the ratification of the 1851 Constitution and the passage of Senate Bill 1, Indiana prohibited abortions

at all stages of the pregnancy to the extent the federal courts interpreting the Federal Constitution permitted. *Supra*, at 3–6. Since shortly after the ratification of the 1851 Constitution, many appellate decisions have evaluated the propriety of indictments and convictions under the abortion statutes in effect, "and none of the resulting opinions even hinted at any concern that the statute violated Section 1 or any other provision in the Indiana Constitution." *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 990 (Ind. 2005) (Dickson, J., concurring) (collecting authority).

Our Court did not confront a claim that there was a fundamental right to abortion until 1972, and that claim related only to the Federal Constitution. *Cheaney v. State*, 259 Ind. 138, 285 N.E.2d 265, 266 (1972). Our predecessors in that case rejected the argument, explaining that courts had for centuries "recognized the property rights of an unborn child without regard to the state of gestation" and that an "infant" in "the mother's womb[] is supposed in law to be born for many purposes." *Id.* at 267 (quotations omitted). After acknowledging that English common law only criminalized abortion after quickening, the Court explained the distinction was no longer significant because quickening was just "a short-hand method for the common law to establish the point in time when the unborn child first became a living being." *Id.* at 268. "[T]he first time the mother felt movement" reflected "the first manifestations of life separate and distinct from the mother." *Id.* But "medical science has made great strides since that time and quickening can no longer be considered the point at which independent life begins." *Id.*

It was almost 200 years after Indiana achieved statehood that our Court first had a case presenting the question whether Article 1, Section 1 protected a fundamental right to abortion, and we did not decide the question because it was unnecessary for resolving the appeal. *Brizzi*, 837 N.E.2d at 978. The lone dissent in that case concluded Section 1 protects a fundamental right to abortion, but that opinion acknowledged "it is fair to assume that no delegate to the Convention believed that, by adopting Section 1, the framers were creating a right in pregnant women to choose to terminate their pregnancies*." Id.* at 999 (Boehm, J., dissenting).

*Dobbs* exhaustively surveyed common law authorities leading up to the

time of Indiana's founding, and those authorities also confirm there was no common understanding of a fundamental right to abortion. 142 S. Ct. at 2249–51.

> Until the latter part of the 20th century, there was no support in American law for a constitutional right to obtain an abortion. No state constitutional provision had recognized such a right. Until a few years before *Roe* was handed down, no federal or state court had recognized such a right. Nor had any scholarly treatise of which we are aware. And although law review articles are not reticent about advocating new rights, the earliest article proposing a constitutional right to abortion that has come to our attention was published only a few years before *Roe*.

*Id.* at 2248 (footnote omitted).

The dissent believes we misunderstand or oversimplify this history in four respects, but the critiques confirm rather than refute our conclusion. *Post*, at 11–14 (opinion of Goff, J.). We set aside for a moment our differing view of the historical record and assume each of the dissent's historical descriptions are correct: (1) Indiana first criminalized abortion 188 years ago rather than 215 years ago; (2) one motivation for earlier abortion laws was that abortion was unsafe for women; (3) early Indiana law recognized the unborn as a person with rights separate from the pregnant woman only after she first felt a fetal movement ("quickening"); and (4) a failed legislative effort in 1967 to legalize abortion demonstrates that legislative views of abortion have shifted over time. *Id.* All those points illustrate that for as long as the 1851 Constitution has been in force, Indiana has always delegated to the General Assembly the responsibility for determining whether and what degree to limit abortion, and Indiana has not treated abortion as a fundamental right.

For their part, Plaintiffs acknowledge Indiana's history of prohibiting abortion, but they urge us to view that history, along with the term "liberty," through a lens focused on women's equality, mindful that constitutions must be applied in evolving times of social progress. With that much, we agree. There is no question that, in 1851, women were not

treated as equal participants in Indiana's civic and political society. And since 1851, women in Indiana have encountered substantial obstacles in progressing toward equality in legal, political, civic, and other societal arenas. Equally true, only women endure pregnancy's greatest burdens, which are undeniably varied.

We do not diminish a woman's interest in terminating a pregnancy because, for starters, it is a privately held interest—informed by privately held considerations. Moreover, we recognize that many women view the ability to obtain an abortion as an exercise of their bodily autonomy. Yet, and however compelling that interest is, it does not follow that it is constitutionally protected in all circumstances.

In determining whether our Constitution protects a woman's interest in obtaining an abortion when not necessary to protect her life or health, Plaintiffs concede a legitimate, competing interest: the State's interest in protecting prenatal life. This interest reflects a legislative view that legal protections inherent in personhood commence before birth. And the State points to biological markers consistent with this conclusion—including fetal brain development, a heartbeat, and breathing—which lead the State to emphasize that "unborn children, being human beings, have all the characteristics of a human being," and many of those characteristics are "acquired in the earliest stages of pregnancy." Appellants' Br. at 57 (emphasis omitted). Considerations like those have led to a broad legal consensus—which Plaintiffs join—that there is at least some point in the pregnancy before birth when the State may generally prohibit abortions (with life and health exceptions), notwithstanding a woman's interest in terminating that pregnancy.

State governments around the country and governments around the world take varied approaches to balancing a woman's interest in terminating a pregnancy against the government's interest in protecting

the prenatal life that abortion would terminate.[14] Many take Indiana's approach, generally prohibiting abortions with exceptions. Many others take the approach Plaintiffs propose, banning abortions only after 23 or 24 weeks, when the fetus would be viable outside the womb. Others take an approach in between, banning abortions at various gestational limits—including 6 weeks, 15 weeks, 18 weeks, 20 weeks, or 22 weeks—based on considerations like the detection of a fetal heartbeat, fetal brain development, and when they conclude a fetus can feel pain. Some add yet another layer of variation with exceptions related to health, social, or economic considerations.

Plaintiffs' acknowledgment that constitutional recognition of women's equality does not preclude the General Assembly from prohibiting abortion (at least at some point in the pregnancy) reflects that their facial challenge to Senate Bill 1 does not present a question about how to apply an old constitutional provision to unforeseen circumstances; a question about how to treat men and women equally; or a question about how to ensure women have sufficient influence in lawmaking. The question is whether our Constitution entrusts to the General Assembly or to our Court the policymaking discretion to decide which of these varied approaches best balances the irreconcilable interests of a woman wishing to terminate a pregnancy against the interest in the prenatal life that abortion would terminate.

The answer, in short, is that our history and traditions reflect that Hoosiers have generally delegated this responsibility to the General Assembly, which—as a legislative body with representatives in both

---

[14] For surveys of the laws discussed in this paragraph, see Allison McCann et al., *Tracking the States Where Abortion is Now Banned*, N.Y. Times, www.nytimes.com/interactive/2022/us/abortion-laws-roe-v-wade.html [https://perma.cc/X9Z3-DDPZ] (June 5, 2022, 11:00 AM); *State Bans on Abortion Throughout Pregnancy*, Guttmacher Inst. (June 1, 2023), https://www.guttmacher.org/state-policy/explore/state-policies-later-abortions [https://perma.cc/XUT4-7DYC]; and *The World's Abortion Laws*, Ctr. for Reprod. Rts., https://reproductiverights.org/maps/worlds-abortion-laws/ [https://perma.cc/7CC8-CNJT] (last visited June 29, 2023).

chambers constantly answerable to their constituents throughout the State in recurring elections—should continually recalibrate this interest-balancing to reflect society's contemporary views. To be sure, abortion legislation must still comply with the constitutional limits that apply to all legislation. That includes limiting governmental authority to a proper exercise of the police power, Ind. Const. art. 1, § 1, and forbidding the General Assembly from granting "to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens," *id.* § 23. But Hoosiers have not delegated this policymaking responsibility to our five-member, unelected Court, which does not have the institutional tools to discern Hoosiers' divergent views on whether abortion generally should be legal; whether abortion's legality should be subject to gestational limits, and if so, what those limits should be; and whether and which other exceptions should apply to abortion limits.

Of course, our Constitution leaves space for contemporary attitudes to shape how questions unanticipated at the founding are resolved. *See, e.g.*, *In re Leach*, 134 Ind. 665, 34 N.E. 641, 642 (1893) ("The fact that the framers of the constitution, or the legislators, in enacting our statute, did not anticipate a condition of society when women might desire to enter the profession of law for a livelihood cannot prevail as against their right to do so independently of either."). And our Constitution presumes society will progress, which is why it includes an amendment process Hoosiers have repeatedly used (although we express no view on the political question presented by the dissent's invitation for Hoosiers to exercise that right). But we have no commission to revise the Constitution through judicial interpretation, and Hoosiers' fundamental rights are more secure as a result. For "[i]f we can add to the reserved rights of the people, we can take them away; if we can mend, we can mar; if we can remove the landmarks which we can find established, we can obliterate them; if we can change the constitution in any particular, there is nothing but our own will to prevent us from demolishing it entirely." *Welling v. Merrill*, 52 Ind. 350, 353 (1876). The same provision in Indiana's Bill of Rights that Plaintiffs ask us to enforce—Section 1—confirms "the people have, at all times, an indefeasible right to alter and reform their government," Ind.

Const. art. 1, § 1, and we cannot disregard the amendment process they have established for doing so.

In sum, our State's history and traditions, as reflected in our Court's precedents, indicate that the common understanding of Section 1 among those who framed and ratified it was that it generally left the General Assembly with broad legislative discretion to limit abortion. And the common understanding of those who proposed and ratified the 1984 amendment changing Section 1's reference from "men" to "people" was that this change did not alter Section 1's meaning, which we discuss next.

### 2. The 1984 amendment revising the Constitution to use gender neutral terms did not create a fundamental right to abortion.

In 1984, voters ratified an amendment to Article 1, Section 1 changing its statement that "all *men* are created equal" to say instead that "all *people* are created equal." Again, we must determine "the common understanding of the proposers and ratifiers of the constitutional amendment." *Campbell v. City of Indianapolis*, 155 Ind. 186, 57 N.E. 920, 928 (1900). And here again, the historical evidence is clear: the amendment was a purely stylistic update to the Constitution, and our Court previously recognized "the General Assembly desired no substantive change." *Gallagher v. Ind. State Election Bd.*, 598 N.E.2d 510, 514 n.4 (Ind. 1992). A century before the 1984 amendment, our Court had already held that our Constitution protects men and women equally. *Leach*, 34 N.E. at 642. Changing "men" to "people" in the 1984 amendment simply better reflected that understanding and was further meant to avoid offense.

Context is illuminating here. To amend our Constitution, the General Assembly must twice approve a proposed amendment by a majority vote in both chambers in successive legislative sessions, and then a majority of voters must ratify the amendment. Ind. Const. art. 16, § 1. The 1984 change to Article 1, Section 1 was one of over thirty changes to the Constitution proposed by a legislative Committee to Review Obsolete Provisions Contained in the Indiana Constitution. *See* Comm. to Rev. Obsolete

Provisions Contained in the Ind. Const., *Final Report* 3–5 (1981).

The General Assembly twice approved these changes through legislation with bill digests describing the changes as "amend[ing] the Constitution of the State of Indiana by updating certain antiquated style, language, or provisions," and with the legislation then specifically identifying each of the dozens of revisions. Pub. L. No. 231, 1982 Ind. Acts 1658, 1658; *see also* Pub. L. No. 383-1983, 1983 Ind. Acts 2206, 2206. The 1982 vote supporting the amendments was 82 to 8 in the House of Representatives and 42 to 2 in the Senate; the 1983 vote was 95 to 0 in the House of Representatives and 48 to 1 in the Senate. H. Journal, 102d Gen. Assemb., 2d Reg. Sess. 475 (Ind. 1982); S. Journal, 102d Gen. Assemb., 2d Reg. Sess. 377 (Ind. 1982); H. Journal, 103d Gen. Assemb., 1st Reg. Sess. 429 (Ind. 1983); S. Journal, 103d Gen. Assemb., 1st Reg. Sess. 505 (Ind. 1983). Roughly 70% of voters then approved those changes by voting "yes" to a ballot question phrased similarly to the bill digest, asking voters: "Shall the Constitution of the State of Indiana be amended by removing or restating certain antiquated language or provisions to reflect today's conditions, practices, or requirements?" Ind. Sec'y of State, *Election Report State of Indiana* 77–78 (1984).

For Article 1, Section 1, the Committee's Final Report explained that the amendment "[s]trikes the masculine word 'men' because it is offensive to many people as used and substitutes 'people', because it refers to both males and females." Comm. to Rev. Obsolete Provisions Contained in the Ind. Const., *supra*, § 2, at 3. The Committee likewise proposed—and the General Assembly and voters ultimately agreed—to change nine other references in similar fashion throughout the Constitution from terms like "men" or "man" to gender neutral terms like "people" or "person."[15] The

---

[15] *See* Pub. L. No. 231, § 2, 1982 Ind. Acts 1658, 1658 (amending "men" to "people" in Article 1, Section 1 of the Indiana Constitution); *id.* § 3, 1982 Ind. Acts at 1658 (similarly amending Article 1, Section 2); *id.* § 4, 1982 Ind. Acts at 1658 (amending "man" to "person" in Article 1, Section 4); *id.* § 5, 1982 Ind. Acts at 1658 (amending "man" to "person" in Article 1, Section 12); *id.* § 6, 1982 Ind. Acts at 1659 (amending "man's" to "person's" in Article 1, Section 21); *id.* § 19, 1982 Ind. Acts at 1662 (amending "[h]e" to "[t]he Governor" in Article 5, Section 13); *id.* §

amendments also removed other offensive references to race and disability throughout the Constitution. *Id.* §§ 7, 30, 32, at 3, 5.

As for the ballot question's reference to changes reflecting "today's conditions, practices, or requirements," both the Committee and the General Assembly were specific about what they were changing. For example, they eliminated former Article 2, Section 7, which prohibited those who had engaged in a duel from holding office, and the Committee explained they were making the change because the provision was "antiquated." *Id.* § 10, at 3. The proposed amendments changed the legislative bill reading requirements "to conform to the long-standing practice of reading bills by title instead of by sections." *Id.* § 18, at 4. And they struck "a phrase that has been obsolete for many years protecting the state from liability for events that occurred prior to 1851." *Id.* § 20, at 4.

Plaintiffs argue, and the dissenting opinion agrees, that changing the reference in Article 1, Section 1 from "men" to "people" reflects a common understanding between both the General Assembly and a majority of voters in 1984 that our Constitution should protect a fundamental right to abortion. They infer from the ballot question's reference to "today's conditions, practices, or requirements" that legislators and voters were contemplating *Roe*'s recognition of a fundamental right to abortion. But that is not a fair inference for a few reasons.

Most importantly, there is no need to resort to inference at all. The legislation proposing the amendments specifically identified each of the conditions, practices, or requirements the General Assembly believed obsolete—provisions related to practices like dueling or to concerns like liability for events which occurred before 1851—and none of the changes had anything at all to do with abortion. Indeed, none of the changes dealt with anything controversial, which is why the vote to approve the

---

20, 1982 Ind. Acts at 1662 (similarly amending Article 5, Section 16); *id.* § 21, 1982 Ind. Acts at 1662–63 (similarly amending Article 5, Section 17); *id.* § 23, 1982 Ind. Acts at 1663 (similarly amending Article 5, Section 20); *see also* Pub. L. No. 383-1983, §§ 2–6, 19–21, 23, 1983 Ind. Acts 2206, 2206–07, 2210–11.

changes was nearly unanimous in the General Assembly. Of course, near unanimity would not be expected if legislators were under the impression they were addressing an issue that was hotly contested among their constituents, such as whether there should be a constitutional right to abortion.

Moreover, when the General Assembly revised its statutes to conform to *Roe*, it made clear it disagreed with *Roe*, including in its statutory revisions a statement that it was revising the laws only to comply with "recent Supreme Court decisions," Pub. L. No. 322, § 1, 1973 Ind. Acts 1740, 1741, and disclaiming any "constitutional right to abortion on demand" or approval of "abortion, except to save the life of the mother," *id.* at 1740. Given how contentious the abortion issue has long been, it is unlikely that between 1973 and 1984 the General Assembly not only swung from explicitly disclaiming a constitutional abortion right to implicitly establishing a constitutional abortion right, but it did so with near unanimous support and without even mentioning abortion.

And if Hoosiers in 1984 were amending their Constitution to protect a fundamental right to abortion, it is likely someone would have mentioned it before now. Yet Plaintiffs do not point to any historical evidence—no public statements, newspaper articles, or law review articles—suggesting that either the General Assembly or voters, let alone both, understood that by changing "men" to "people" they were establishing a fundamental right to abortion under the Indiana Constitution.

Tellingly, a group of historians and state constitutional law scholars submitted an amicus brief supporting Plaintiffs' position that the injunction should be affirmed, and their brief does not mention the 1984 amendment at all. The plaintiffs in *Brizzi* never mentioned the 1984 amendment in their briefing to our Court either. And while the dissenting opinion in *Brizzi* concluded that our Constitution should protect an abortion right, the dissent did not look to the 1984 amendment to support that conclusion. Just the opposite, the dissent only mentioned the amendment in a footnote explaining that the amendment made no substantive change and that it had always been understood that the term "men" in Section 1 "was used 'in its general sense' and included women."

*Brizzi*, 837 N.E.2d at 995 n.2.

Finally, while we sometimes look to federal case law as persuasive authority when we interpret state law provisions that are analogous to federal provisions, we have not understood Hoosiers as directing us to adhere to United States Supreme Court opinions interpreting the Federal Constitution when we are tasked with interpreting our own Constitution. We often say just the opposite. *See, e.g.*, *Price*, 622 N.E.2d at 958 ("[W]e find no persuasive precedent for the proposition that federal 'overbreadth analysis' has taken root in the jurisprudence of the Indiana Constitution."). But even if Hoosiers had directed through the 1984 amendment that our Court should simply proceed in lockstep with the United States Supreme Court's opinions about the scope of liberty, that Court has now held there is no fundamental right to abortion under the Federal Constitution.

In short, Plaintiffs have not identified any compelling evidence suggesting the framers and ratifiers who amended Section 1 in 1984 had a common understanding that by changing "men" to "people" they were creating a fundamental right to abortion, and there is overwhelming evidence to the contrary.

### C. Senate Bill 1 can be enforced consistent with Section 1's limitation of governmental authority to advance the public's health, welfare, and safety.

Even though Article 1, Section 1's "liberty" protection does not cover the broad abortion right Plaintiffs claim, the provision still restrains the General Assembly to legislating only to advance the police power. And when advancing the police power, the General Assembly may not pass laws which are "arbitrary" or "patently beyond the necessities of the case." *Dep't of Fin. Insts. v. Holt*, 231 Ind. 293, 108 N.E.2d 629, 634 (1952). In other words, "the means used by the General Assembly . . . must have some reasonable relation to the accomplishment of the end in view." *Hanley v. State*, 234 Ind. 326, 123 N.E.2d 452, 455 (1954). When we undertake that review, we evaluate only the boundaries of legislative

power, not the wisdom of legislative policy. *Holt*, 108 N.E.2d at 634.

Our precedents have long recognized that protecting prenatal life is an appropriate exercise of the police power, which Plaintiffs acknowledge. *See Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247, 257 (Ind. 2003) (holding that the State has a legitimate "interest in protecting fetal life"). And Plaintiffs do not argue that Senate Bill 1's general ban on abortions with limited exceptions has no reasonable relation to protecting prenatal life. That is reason enough not to affirm the injunction on the basis that the law is unconstitutionally arbitrary.

None of this is to comment on whether the General Assembly's approach has been wise or unwise, just or unjust, moral or immoral. We simply recognize that enjoining Senate Bill 1 as a facially arbitrary law would not be an appropriate exercise of our judicial review power. Because there are circumstances in which Senate Bill 1 can be enforced as a proper exercise of the State's police power, Plaintiffs cannot show a reasonable likelihood of success on the merits of their facial challenge.

## IV. Vacating the injunction does not preclude future facial or as-applied challenges.

We are mindful that today's decision does not end the litigation on Plaintiffs' remaining claim that Senate Bill 1's hospital requirements for performing abortions discriminate against abortion providers in violation of Article 1, Section 23's Equal Privileges and Immunities Clause, which is not part of this appeal. And the decision will not foreclose future abortion litigation in Indiana more broadly. By saying Senate Bill 1 is not unconstitutional in its entirety in all circumstances, we do not say the opposite either—that every single part of the law can be applied consistent with our Constitution in every conceivable set of circumstances. We do not prejudge those questions.

So, while Plaintiffs' facial challenge to the entire statute fails, that does not preclude plaintiffs with standing from pursuing a facial challenge to a particular part of the statute, or an as-applied challenge to the State enforcing the law in a particular set of circumstances. *See League of Women*

*Voters of Ind., Inc. v. Rokita*, 929 N.E.2d 758, 760 (Ind. 2010) ("Determining that this case presents only facial challenges to the constitutionality of the Voter ID Law, we now affirm the trial court's dismissal of the complaint, but without prejudice to future as-applied challenges by any voter unlawfully prevented from exercising the right to vote.").

# Conclusion

Plaintiffs, which are mostly abortion providers, have standing to challenge Senate Bill 1 because the law criminalizes their work and the injunction they seek would protect them from the law's criminal and regulatory penalties. Additionally, Article 1, Section 1, which is judicially enforceable, protects a woman's right to an abortion that is necessary to protect her life or to protect her from a serious health risk. But Section 1 generally permits the General Assembly to prohibit abortions which are unnecessary to protect a woman's life or health, so long as the legislation complies with the constitutional limits that apply to all legislation, such as those limiting legislation to a proper exercise of the police power and providing privileges and immunities equally. Because the State can enforce Senate Bill 1 within those constitutional parameters, Plaintiffs have failed to show a reasonable likelihood of success on the merits of their facial challenge. We thus vacate the preliminary injunction and remand for proceedings consistent with this opinion.

Rush, C.J., and Massa, J., concur.
Slaughter, J., concurs in the judgment with separate opinion.
Goff, J., concurs in part and dissents in part with separate opinion.

ATTORNEYS FOR APPELLANTS
Theodore E. Rokita
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

James A. Barta
Deputy Solicitor General

Melinda R. Holmes
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE THE AMERICAN COLLEGE OF
OBSTETRICIANS AND GYNECOLOGISTS, THE AMERICAN
MEDICAL ASSOCIATION, AND THE SOCIETY FOR MATERNAL-
FETAL MEDICINE
Mark W. Sniderman
Findling Park Conyers Woody & Sniderman, P.C.
Indianapolis, Indiana

Nicole A. Saharsky
Mayer Brown LLP
Washington, D.C.

ATTORNEY FOR AMICUS CURIAE ERIC RASMUSEN
Eric B. Rasmusen
Pro Se
Bloomington, Indiana

ATTORNEYS FOR AMICI CURIAE FREDERICK DOUGLASS
FOUNDATION AND NATIONAL HISPANIC CHRISTIAN
LEADERSHIP CONFERENCE
Jared M. Schneider
Schneider Law, P.C.
Bloomington, Indiana

Mathew D. Staver
Liberty Counsel
Orlando, Florida

ATTORNEY FOR AMICI CURIAE HISTORIANS AND STATE
CONSTITUTIONAL LAW SCHOLARS
Lauren Robel
Val Nolan Professor of Law Emerita
Indiana University Maurer School of Law
Bloomington, Indiana

ATTORNEY FOR AMICUS CURIAE INDIANA FAMILY INSTITUTE
Zechariah D. Yoder
Adler Attorneys
Noblesville, Indiana

ATTORNEYS FOR AMICUS CURIAE THE THOMAS MORE SOCIETY
Carlos Federico Lam
Lam Law Office
Indianapolis, Indiana

Paul Benjamin Linton
Northbrook, Illinois

**Slaughter, J., concurring in the judgment.**

For the first time in our state's history, the Court holds that the Indiana Constitution protects a woman's right to terminate her pregnancy. The Court's unprecedented conclusion is both momentous and unnecessary on this record. The only issue before us is the propriety of the trial court's preliminary injunction. That narrow issue can, and thus should, be resolved without reaching any of the constitutional questions upon which the Court opines gratuitously.

Also without precedent is the Court's ruling that Plaintiffs have standing—the right to seek judicial relief for their alleged injury. The problem is not that Plaintiffs lack sufficient prospective injury to themselves to confer standing. The problem is that the claim at issue in this appeal—that Senate Bill 1 violates a constitutionally protected abortion right under article 1, section 1—is not "their" claim. Plaintiffs do not allege that Senate Bill 1 violates their own rights but the rights of pregnant women. Until today, we have never held that standing exists under Indiana law to permit an aggrieved claimant to seek judicial redress for itself by asserting a claim belonging to someone else. In fact, we have held the opposite.

Despite our differences, I ultimately agree with the Court that the disputed injunction must be vacated, and so I concur in its judgment. But unlike the Court, I would reach that result based on the lack of standing and not on the merits.

A

As the Court notes, *ante*, at 9, standing is derived from our state constitution's separation-of-powers mandate, Ind. Const. art. 3, § 1, and is jurisdictional in that it limits courts to exercising only judicial power, *id.* art. 7, § 1 (assigning the "judicial power"). "The standing requirement is a limit on the court's jurisdiction which restrains the judiciary to resolving real controversies in which the complaining party has a demonstrable injury." *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995) (quoting *Schloss v. City of Indianapolis*, 553 N.E.2d 1204, 1206 (Ind. 1990)). Because it is jurisdictional, standing is a "threshold" issue antecedent to any discussion

of a case's merits. *Horner v. Curry*, 125 N.E.3d 584, 592 (Ind. 2019) (recognizing standing as a "threshold matter"); *Pence*, 652 N.E.2d at 487 (providing that "threshold question of standing" precedes merits discussion).

To ensure courts act within our proper sphere, we must raise any lack-of-standing concerns ourselves, even if the parties do not. Last year in *Solarize Indiana, Inc. v. Southern Indiana Gas & Electric Co.*, 182 N.E.3d 212 (Ind. 2022), we dismissed one of the litigants for lack of standing, although no party had objected to standing below. *Id.* at 216. Because standing is jurisdictional, the importance of a claim's merits does not give us license to ignore constitutional limits on our exercise of judicial power.

To prove standing, Plaintiffs claim they face some combination of criminal liability and professional sanction if Senate Bill 1 is enforced against them. They claim their threatened injury is attributable to the actions of the named defendants, which consist of state medical-licensing officials and prosecuting attorneys in the counties where they do business. And they claim any harm they may face would be remedied by a favorable judicial decree. These allegations, they believe, entitle them to proceed with a state constitutional claim under article 1, section 1.

Plaintiffs are correct that these three elements—injury, causation, redressability—are necessary to establish standing, but they are not sufficient. Implicit in all three requirements is the further requirement that Plaintiffs are seeking recourse for their own claim. We said as much in *State v. Clark*:

> In other words, one may attack the constitutionality of a statute only when and as far as it is being, or is about to be, applied to his disadvantage; and to raise the question he must show that the alleged unconstitutional feature of the statute injures him and so operates as to deprive him of a constitutional right, and, of course, **it is prerequisite that he establish in himself the claimed right which is alleged to be infringed**.

247 Ind. 490, 494, 217 N.E.2d 588, 590 (1966) (emphasis added) (quoting 16 C.J.S. *Constitutional Law* § 76 (1956)). A "prerequisite" to standing, in other words, is that a plaintiff must show not only that she is injured but that the right she is asserting is her own.

Since our decision in *Clark*, we have reaffirmed this "own-right" standing prerequisite. See *Gross v. State*, 506 N.E.2d 17, 21 (Ind. 1987) (holding that defendant lacked standing to argue the habitual-offender statute violated equal protection because his "rights were not affected in any way" by the allegedly unconstitutional statute); see also *Terrel v. State*, 170 Ind. App. 422, 427, 353 N.E.2d 553, 556 (1976) (holding that defendant lacked standing to challenge constitutionality of the criminal statute because his "due process rights will not have been impaired" by the allegedly unconstitutional portion of the statute). Indeed, the Indiana Law Encyclopedia acknowledges this aspect of our state's standing law in the very same section the Court cites for its contrary view: "To have standing to challenge the constitutionality of a statute, the appellant must establish that **his or her rights were adversely affected** by operation of both the statute and the particular section he or she is attacking." 5 Indiana Law Encyc. Constitutional Law § 22 (2017) (emphasis added); *ante*, at 10. Here, the abortion right Plaintiffs seek to vindicate under article 1, section 1 belongs not to themselves but to their pregnant patients.

Despite these authorities, the Court observes we have "repeatedly reviewed the constitutionality of abortion laws based on abortion providers' claims that the laws are unconstitutional because they violate their patients' rights." *Ante*, at 10. But the four cases the Court cites for this proposition do not establish Plaintiffs' standing under Indiana law. Three of the cases relied on **federal** standing principles, though federal precedents finding third-party standing for abortion providers are no longer on firm ground after *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) (noting that prior abortion-provider cases "ignored the Court's third-party standing doctrine"). *Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247 (Ind. 2003) (not addressing standing after trial court relied on federal law to find standing when provider-plaintiffs alleged state constitutional claims); *A Woman's Choice-E. Side Women's Clinic v. Newman*, 671 N.E.2d 104 (Ind. 1996) (answering certified question from

federal court on the meaning of Indiana's abortion law in case raising federal constitutional challenge); *Cheaney v. State*, 259 Ind. 138, 140, 285 N.E.2d 265, 266 (1972) (alleging Indiana abortion law violates Ninth Amendment to federal constitution). The fourth case, *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973 (Ind. 2005), did not address standing at all and rejected the plaintiffs' merits claim that the challenged abortion law was unconstitutional under article 1, section 1.

Our reliance on federal standing principles has been inconsistent and selective. We have embraced federal law to the extent it permits claimants to assert the rights of third parties. See *Humphreys*, 796 N.E.2d 247; *A Woman's Choice*, 671 N.E.2d at 106–07; *Cheaney*, 285 N.E.2d at 266. But we have ignored federal law to the extent it insists "a plaintiff must demonstrate standing for each claim he seeks to press", *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citing *Allen v. Wright*, 468 U.S. 737, 752 (1984)). See *Brizzi*, 837 N.E.2d 973 (not addressing standing). As noted, Plaintiffs here do not assert their own claims under article 1, section 1. Yet the Court proceeds to reach the merits of their claim. Indiana law does not support Plaintiffs' standing as to this claim.

B

As noted, the Court sees things differently. It finds standing here and proceeds to the injunction's merits. Even assuming for argument's sake that it is proper for the Court to reach the merits here, the Court says more than it needs to in deciding this appeal.

As Plaintiffs acknowledge, they bring a facial challenge to Senate Bill 1. Yet they concede there are permissible, meaning lawful, applications of Senate Bill 1. That means their facial challenge to this legislation must fail, and the injunction banning enforcement of **all** its applications must be vacated. If the Court is going to address the merits, that is the entirety of what it needs to say about the trial court's entry—and all it should say.

The Court, instead, says much more. Its statements today recognize an abortion right and define its minimum contours as protecting a woman's right to terminate a pregnancy to protect her life or to protect her from a serious health risk. *Ante*, at 8. This conclusion is premature both because

of this appeal's procedural posture and because Senate Bill 1 already contains exceptions to its abortion ban, including exceptions for a pregnant woman's life and health. We engage in judicial overreach—and flout our doctrine of constitutional avoidance—when we proclaim the existence and scope of an unenumerated constitutional right without first addressing whether Senate Bill 1's exceptions protecting a pregnant woman's life and health allow the procedure. Ind. Code § 16-34-2-1(a)(1), (3). We should refrain from taking such a giant jurisprudential leap until we are presented with an appeal that squarely presents these constitutional questions. This appeal does not.

It has been nearly twenty years since we issued our last major abortion ruling in *Brizzi*, 837 N.E.2d 973. There, we considered the constitutionality of a statute requiring a woman seeking an abortion to give her informed consent to the procedure and, except in case of medical emergency, requiring a medical professional to advise her in person of certain information about the procedure at least eighteen hours before undergoing it. *Id.* at 976–77. On the merits, we rejected the plaintiffs' facial challenge under article 1, section 1 because they failed to show the challenged statute was unconstitutional in all its applications. *Id.* at 981. And we held that any as-applied challenge would fail because the law did not impose a material burden on any constitutional right that may exist under article 1, section 1. *Id.* at 982. Thus, we affirmed the trial court's dismissal of the plaintiffs' complaint, and we specifically avoided deciding whether an abortion right exists under that provision. *Id.* at 978. In other words, we decided no more than was necessary to resolve the issue before us, and we expressly avoided constitutional questions not essential to our holding.

In stark contrast, the Court today dives into the constitutional scrum, pronouncing its views of myriad issues not squarely before us and not necessary to today's disposition. I would limit our decision today to Plaintiff's lack of standing. But given the Court's resolve to reach the merits of the preliminary injunction, it should, consistent with our modest approach in *Brizzi*, avoid deciding unnecessary constitutional questions. Thus, it should confine its ruling to Plaintiffs' admission that Senate Bill 1 has some lawful applications. That means the injunction, which was

premised on the trial court's view of a likely successful facial challenge, must be vacated.

*     *     *

For these reasons, I concur in the Court's judgment but do not join its opinion.

**Goff, J., concurring in part and dissenting in part.**

The issue directly before this Court today is whether Indiana's constitution protects a woman's qualified right to an abortion. But the ramifications, I submit, are much broader than a simple dichotomy between "a woman's interest in ending a pregnancy" and the State's competing "interest in protecting the life that abortion would end."[1] Many of the liberties Hoosiers take for granted—the right to vote, to travel, to marry, to educate one's children as one sees fit, or to refuse medical treatment—stand on federal precedents that are also now vulnerable to reversal. Within this "bundle of liberty rights" stands the fundamental "right to be let alone."[2] In my view, even those who abhor abortion in all circumstances should be wary of unfettered government power over the most personal, private aspects of a person's life.

When, like here, a longstanding right is stripped from the United States Constitution, the only remaining restraint on the Indiana General Assembly's lawmaking power is our **state constitution**. That document guarantees "liberty" to all, an idea that means different things to different people. And when those ideas stand in tension, the state is responsible for protecting the minority interests against those of the majority. Otherwise, no one's liberty is secure. In addressing this case, therefore, we decide how much power the legislature has to restrict many of the freedoms that Hoosiers have come to depend on. And we resolve whether our Court will require the legislature to balance those freedoms **meaningfully** against its legitimate policy goals.

Here, the Plaintiffs sought an injunction after the General Assembly enacted—in just eleven days—Senate Bill 1, making abortion unlawful from the moment of conception, except in a few narrow circumstances. I

---

[1] *Ante*, at 2.

[2] *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 1001, 1002 (Ind. 2005) (Boehm, J., dissenting) (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).

agree with the Court's conclusion that the Plaintiffs have standing to seek injunctive relief. I also agree that Article 1, Section 1 of the Indiana Constitution is judicially enforceable and that it prohibits the government from compelling a woman to continue a pregnancy that would kill or endanger her. But I part ways with my colleagues' decision to terminate the trial court's injunction in its entirety. In my view, there is a reasonable likelihood that Article 1, Section 1's guarantee of "liberty" includes a qualified right to bodily autonomy, one which the General Assembly must accord some weight in the legislative balance.

More importantly, I believe that the abortion question is fundamentally a matter of constitutional dimension that should be decided directly by the sovereign people of Indiana. I would thus urge my colleagues in the General Assembly to put before Hoosier voters the question whether the term "liberty" in Article 1, Section 1 of the Indiana Constitution protects a qualified right to bodily autonomy.

## I. The status of a recently erased liberty right is a constitutional question for the people, not one solely for the legislative or judicial branches.

For the last five decades, our federal constitution—as interpreted under one theory by a temporary majority of the United States Supreme Court—guaranteed a qualified right to abortion in all fifty states.[3] But last year, our federal constitution—as interpreted under a different theory by a newly configured, temporary majority of the Supreme Court—lost that guarantee completely.[4] A federal right, ingrained in our society for nearly half a century, evaporated overnight.

When *Dobbs* was handed down, Indiana had neither state-level constitutional protection for the right to choose nor a trigger law to put an

---

[3] *See Roe v. Wade*, 410 U.S. 113 (1973); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992).

[4] *See Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022).

abortion ban into effect, depriving Hoosiers of any notice that a significant change in the law would follow if the federal barrier were ever lifted. Rather than hold a constitutional referendum (like some other states), our colleagues in the General Assembly used a special legislative session (called for a wholly unrelated purpose) to implement a moment-of-conception abortion ban with only narrow exceptions. From first reading to the Governor's desk, Senate Bill 1 took just **eleven days** to become law.[5] In fairness to our colleagues in the General Assembly, the United States Supreme Court left the abortion issue "to the people and their elected representatives."[6] The *Dobbs* decision, moreover, was unprecedented in our nation's history; it simply could not have been predicted a generation ago. Still, *Dobbs* highlights an important principle in the preservation of our constitutional order: The people's rights cannot be "only as secure" as the United States Supreme Court "wishes to make them."[7]

The divisive nature of the abortion debate makes the question in this case especially difficult. But *Dobbs* compels us to try, because we may yet have to grapple with other divisive issues once thought to have been settled. Granted, the *Dobbs* Court took pains to "emphasize that [its] decision concerns the constitutional right to abortion and no other right."[8] But Justice Thomas, concurring in the Court's opinion, called for reconsideration of **all** the Supreme Court's due process precedents, including those protecting rights to contraception, private sexual activity, and gay marriage.[9] And, as the dissent by Justices Breyer, Sotomayor, and Kagan explained, these rights are "all part of the same constitutional fabric, protecting autonomous decisionmaking over the most personal of life decisions."[10] *Dobbs* thus places in doubt the protection of any rights

---

[5] S. Journal, 122nd Gen. Assemb., 1st Spec. Sess. 1006, 1058 (2022).

[6] *Dobbs*, 142 S.Ct. at 2284.

[7] Hon. Randall T. Shepard, *Second Wind for the Indiana Bill of Rights*, 22 Ind. L. Rev. 575, 586 (1989).

[8] *Dobbs*, 142 S.Ct. at 2277.

[9] *Id.* at 2301.

[10] *Id.* at 2319.

not expressly enumerated in the United States Constitution. Such rights, beyond those mentioned by Justice Thomas, could include the right to vote, travel, marry, live with extended family, educate one's children as one sees fit, or to refuse sterilization or surgery.[11] If the United States Supreme Court reversed itself on any of these rights, Hoosiers' only source of legal protection against an overreaching state government would be their own constitution.

Mindful of this broader context, we are tasked today with determining whether Senate Bill 1 violates the Indiana Constitution. Critical to this task is the recognition that neither we, nor our predecessors on the Indiana Supreme Court, have ever before decided whether Article 1, Section 1 includes a qualified right to bodily autonomy. In *Clinic for Women, Inc. v. Brizzi*, three members of this Court declined to answer the question while one said there was a right and one said there was not.[12] Our predecessors, naturally, had no pressing need to answer the question because the United States Supreme Court had already answered it for all of us. But that has since changed, and we're now left to fill the constitutional vacuum that *Dobbs* created.

Of course, any action we take to fill the void risks criticism as violating the separation of powers. On the other hand, prudential concerns counsel in favor of searching judicial review of legislation. Our constitution aims to prevent the concentration of authority in one branch of government. This Court, then, must supply a balance to the political branches and check any legislative overreach. We forsake that duty by simply deferring to the General Assembly's decision on how to weigh the people's liberty. To be sure, line-drawing on this issue is generally beyond the judicial purview. As we've emphasized before, such "classification," is largely "a

---

[11] In fact, this Court has held that a trial court has inherent authority to order the sterilization of an incompetent child where "clear and convincing evidence" shows "that the medical procedure was in the best interest of the child." *P.S. by Harbin v. W.S.*, 452 N.E.2d 969, 976 (Ind. 1983).

[12] 837 N.E.2d at 978; *id.* at 988 (Dickson, J., concurring in result); *id.* at 1005 (Boehm, J., dissenting).

question for the legislature."[13] Yet there are "certain preserves of human endeavor" on "which the State must tread lightly, if at all"—"core values" that the legislature "may qualify but not alienate."[14] In these areas, this Court must ensure that statutes leave sufficient scope for Hoosiers to exercise their freedom.

Ultimately, however, legislatures and courts are not the ultimate authority on questions of constitutional dimension. The people of Indiana should speak **directly** to the issue before us today through the constitutional amendment process. As the *Dobbs* Court itself instructed, the "permissibility of abortion, and the limitations, upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting."[15] I would therefore urge my colleagues in the General Assembly to put to the people the issue of whether the guarantee of "liberty" in Article 1, Section 1 of the Indiana Constitution includes a qualified right to bodily autonomy.

Until that opportunity comes, and taking the constitution as it stands today, I would find a qualified right to bodily autonomy for the reasons I expand on below.

## II. Senate Bill 1 is likely unconstitutional as applied because it lacks any means of balancing a woman's right to liberty against the State's interest in regulating abortion.

I depart from the Court's opinion on procedural grounds and on substantive grounds. Procedurally, I reject the idea that an unsuccessful facial challenge precludes further consideration of the Plaintiffs'

---

[13] *Chaffin v. Nicosia*, 261 Ind. 698, 701, 310 N.E.2d 867, 869 (1974) (addressing a claim that legislation violated the equal privileges or immunities clause under Article 1, Section 23 of the Indiana Constitution).

[14] *Price v. State*, 622 N.E.2d 954, 960 (Ind. 1993).

[15] *Dobbs*, 142 S.Ct. at 2243 (citation and quotation marks omitted).

constitutional claim. Substantively, I take a different view of how we should interpret Article 1, Section 1 to resolve the issue before us.

## A. Plaintiffs' unsuccessful facial challenge should not preclude consideration of the issues as applied to them.

Our Court assesses the constitutionality of a statute either "on its face" or "as applied in a particular case."[16] A plaintiff bringing a facial challenge must show that "there are no set of circumstances under which the statute can be constitutionally applied."[17] Courts often view facial challenges with skepticism—and rightly so—because they "require courts to consider hypothetical scenarios involving parties not before the court and to decipher the full meaning of a statute without a chance for its meaning to be developed on a case-by-case basis."[18]

An as-applied challenge, by contrast, alleges that the statute is unconstitutional in the **specific circumstances** before the court.[19] As-applied challenges are "the basic building blocks of constitutional adjudication."[20] They call upon a court to exercise its limited jurisdictional power to "adjudge the legal rights of litigants in actual controversies."[21]

Here, Plaintiffs concede to making a facial challenge and they accept that the State may, subject to exceptions, enforce an abortion ban after some point in a woman's pregnancy.[22] For this reason, I agree with the Court that the Plaintiffs' facial challenge must fail. This conclusion,

[16] *Brizzi*, 837 N.E.2d at 975.

[17] *Id.* at 980 (quoting *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind. 1999)).

[18] Jill Hamers, Note, *Reeling in the Outlier: Gonzales v. Carhart and the End of Facial Challenges to Abortion Statutes*, 89 B.U. L. Rev. 1069, 1070 (2009).

[19] William E. Thro, *Respecting the Democratic Process: The Roberts Court and Limits on Facial Challenges*, 9 Engage: J. Federalist Soc'y Prac. Groups 54, 54 (Oct. 2008).

[20] Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000).

[21] *United States v. Raines*, 362 U.S. 17, 21 (1960).

[22] Oral Argument at 47:55–48:40.

however, should not prevent us from considering the issues as applied to the Plaintiffs and their circumstances. All constitutional challenges to a statute, whether we deem them facial or as-applied, begin with a plaintiff who contends that the Constitution prohibits enforcement of that statute against her.[23] Thus, virtually "**all challenges** are as-applied challenges."[24] In accord with this principle, this Court—including in *Brizzi*—has **routinely** addressed a party's as-applied challenge while declining to address the facial challenge.[25]

Here, the Plaintiffs claim that, but for Senate Bill 1, they would continue to provide or facilitate abortions "consistent with current law."[26] The providers have been performing abortions up to "13 weeks 6 days" since a woman's last menstrual period.[27] This activity was, until recently, federally protected under *Planned Parenthood of Southeastern Pennsylvania v. Casey*.[28] And, at oral argument, counsel explained that the Plaintiffs object to Senate Bill 1 only to the extent it prohibits abortions that were previously protected.[29] Thus, what's at stake in this case is whether the State may "shut down" the Plaintiffs' operations that previously enjoyed

---

[23] Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 Calif. L. Rev. 915, 923 (2011).

[24] *Id.* (emphasis added). In a sense, an as-applied challenge is to a facial challenge what a lesser-included offense is to a greater offense.

[25] In *Brizzi*, there was "no claim" that the challenged abortion statute was "unconstitutional as applied to any particular plaintiff." 837 N.E.2d at 979. But, while concluding that the "plaintiffs' facial challenge must fail," the Court "nevertheless proceed[ed] to analyze whether, if presented with a challenge to the statute as applied, there could be an issue for trial." *Id.* at 981, 982. The Court ultimately "h[e]ld that there could not be because" the challenged statute did "not impose a material burden upon any fundamental right of privacy that includes protection of a woman's right to terminate her pregnancy that might exist under Article I, Section I." *Id.* at 982. *See also Price*, 622 N.E.2d at 958 (passing over an overbreadth challenge and addressing the issue on an as-applied basis); *Martin v. Richey*, 711 N.E.2d 1273, 1279 (Ind. 1999) (same).

[26] Appellant's App. Vol. II, p. 48.

[27] *Id.* at 47.

[28] 505 U.S. at 846.

[29] Oral Argument at 48:35–49:22.

federal protection.[30] Regardless of the "facial challenge" label, I find it appropriate for this Court to provide meaningful review of the parties' rights under these existing circumstances.

## B. The current version of Article 1, Section 1 likely protects a woman's qualified right to bodily autonomy.

Turning to the substantive discussion of the constitutional claim before us, I consider the Court's analysis flawed for two reasons. First, it fails to account for the absence of women in framing our 1851 constitution and unjustifiably diminishes the significance of the 1984 amendment to Article 1, Section 1. Second, it relies on a simplified historical narrative of what the framing generations of both 1851 and 1984 thought about abortion.

## 1. The 1984 amendment to Article 1, Section 1 (rather than the 1851 framing) should mark the starting point for our constitutional analysis.

The critical question before us is whether the trial court abused its discretion in finding a reasonable likelihood that Article 1 Section 1's guarantee of "liberty" for "all people" includes a qualified right to bodily autonomy. To answer that question, my colleagues attempt to discern how our constitutional framers in 1851 understood the text of Article 1, Section 1. Under that interpretive framework, the Court's job is to uncover the "'common understanding of both those who framed'" Article 1, Section 1 "'and those who ratified it.'"[31] The language of this constitutional provision must be treated with "'particular deference, as though every word had been hammered into place.'"[32]

---

[30] Appellant's App. Vol. II, p. 111.

[31] *Ante*, at 11 (quoting *Paul Stieler Enterprises, Inc. v. City of Evansville*, 2 N.E.3d 1269, 1272–73 (Ind. 2014)).

[32] *Id.* (quoting *Meredith v. Pence*, 984 N.E.2d 1213, 1218 (Ind. 2013)).

I appreciate the importance of this interpretive approach. Our founders, engaged in the highest form of representative government, created "the fundamental agreement" between "the citizens who comprise a state."[33] We revere their words not because they are old, but because of the deliberative process that made them part of our organic law. It is no easy task for a word or phrase to find its way into our constitution. And for good reason—the process elevates our constitution beyond the political vagaries of ordinary legislation.

But returning to the 1851 context to discern the rights of twenty-first century women poses undeniable difficulties. In the nineteenth century, Hoosier women enjoyed no right to vote, no right to enact laws, and no right to decide lawsuits, let alone participate in framing our state's organic law.[34] Instead, the prevailing wisdom of the day largely confined women to the domestic sphere, to seek "the retirement of the social hearth," while men gloried in "the path of statesmanship" and "years of honest labor."[35] Women's "natural employment" in the home, it was said, "necessarily limit[ed] their knowledge in matters of civil government."[36] Were a woman to participate "in the affairs of State," the theory went, "she would then cease to be a woman."[37] Reliance on the history made by men holding these views, prevalent at the time of our constitutional drafting, is simply inadequate for charting the liberty of women today. We cannot draw constitutional law on the particular matter of women's rights from the doings of exclusively male institutions in times when women were excluded and marginalized from public discussion.

---

[33] Hon. Randall T. Shepard, *The Renaissance in State Constitutional Law: There Are A Few Dangers, But What's The Alternative?*, 61 Alb. L. Rev. 1529, 1553 (1998).

[34] *See generally* Virginia Dill McCarty, *From Petticoat Slavery to Equality*, in *The History of Indiana Law* 177–84 (David J. Bodenhamer & Hon. Randall T. Shepard eds., 2006).

[35] 1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 503 (1850).

[36] *Id.* at 469.

[37] *Id.* at 472–73.

Still, while the present issue points to obvious problems with unbending fidelity to "originalism," discerning our framers' intent plays an important role in anchoring judicial interpretation. Our constitution, after all, is not an "elastic instrument" that "stretches" by judicial fiat "to meet the demands of the moment."[38] But today we need **not** stretch the original constitution to accommodate our modern sensibilities. The people themselves have updated it. In 1984, Hoosiers approved a constitutional amendment substituting "all people" in Article 1, Section 1 for "all men." Hammering these **new** words into place first required majority approval by two consecutive iterations of our General Assembly.[39] With that hurdle overcome, Hoosier voters then considered at the ballot box whether the constitution should be "amended by removing or restating certain antiquated language or provisions to reflect **today's** conditions, practices, or **requirements**."[40] When a majority of voters answered "yes" to that question, the people of Indiana "respoke" into our organic law the protections embodied in Article 1, Section 1.[41] By amending our Bill of Rights, the **people** corrected an existing democratic deficit in our constitution, securing the liberty of **all** Hoosiers, not just the men enfranchised in 1851. The words were changed, respoken, and hammered into place against a historical backdrop that was far different from the one that existed during the mid-nineteenth century. And it is **that** generation of 1984 whose understanding should provide the starting point for our interpretation.

In 1984, every woman in the United States was guaranteed a qualified right to bodily autonomy by the federal constitution. It didn't matter whether she resided in Orange County, California or Orange County, Indiana. Wherever she lived, the decision to carry a pregnancy to term

---

[38] *Finney v. Johnson*, 242 Ind. 465, 472–73, 179 N.E.2d 718, 721 (1962).

[39] *See* Ind. Const. art. 16, § 1.

[40] Pub. L. No. 218-1984, § 1, 1984 Ind. Acts 1587, 1587 (emphases added).

[41] *See* Kurt Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1444 (2022) (explaining that amending an original constitution may "invest those words with new meaning or clarify their proper interpretation").

belonged, at least during the early parts of her pregnancy, to her and her alone. The government had to respect, at least for a time, her ultimate right to control her own body. That qualified right to bodily autonomy was not secured easily. It was the product of a centuries-long struggle for gender equality. And that qualified right to bodily autonomy, as applied to women who enjoyed full legal citizenship, should inform our understanding of "liberty" as it appears in the current version of Article 1, Section 1.

I make no claim that the 1984 amendment **conclusively** establishes that Hoosiers sought to enshrine the fundamental right to abortion in our organic law. But isn't it likely that many of those who voted to amend Article 1, Section 1, to conform with "**today's** conditions, practices, or **requirements**" might have contemplated that a qualified right to reproductive freedom was in fact the law of the land? And isn't it likely that even those who opposed abortion in 1984 still recognized—albeit grudgingly—that *Roe* established a national right to choose and, thus, expanded our definition of liberty to incorporate that right? Such an inference, in my view, is equally if not more feasible than that reached by the Court.

## 2. The history of abortion in Indiana is not as straightforward as the Court suggests.

In support of its conclusion that the founding generation would **not** have considered abortion as a fundamental right, the Court invokes "Indiana's long history of generally prohibiting abortion as a criminal act."[42] The Court also relies on the protest language used in the 1973 amendments to Indiana's abortion law (adopted in response to *Roe*) as evidence that Hoosiers, in amending our constitution in 1984, had no intention of expanding the definition of "liberty" to incorporate the right

---

[42] *Ante*, at 29.

to choose.[43] But that narrative, in my view, is either flawed or paints too simple a picture.

To begin with, the Court submits that, even before statehood, the Indiana Territorial government enacted a receiving statute adopting English law, "which criminalized abortion after 'quickening.'"[44] The Court, however, cites no English law to support this assertion. To be sure, the British Parliament adopted legislation in 1803 making abortion a crime at all stages of pregnancy.[45] But Indiana's reception statute adopted only the "Common Law of England, all statutes or acts of the British Parliament, made in aid of the Common Law, **prior to**" 1607 (reflecting the significance attributed to the English settlement at Jamestown).[46] Because the English Act of 1803 came nearly **two-hundred years after** the cut-off date for receiving English laws, Indiana did **not** in fact receive it as part of its own law.

Second, while each of the Indiana statutes enacted during the nineteenth century unquestionably criminalized abortion, the historical record—and the text of the statutes themselves—suggest a legislative design "not to prevent the procuring of abortions, so much as to guard the health and life of the mother against the consequences of such attempts."[47] Commercial vendors in the 1850s openly advertised their abortion drugs in newspapers like the *Indianapolis Daily State Sentinel*, promising to "bring on Miscarriage," remove "all obstructions," and restore "the monthly period with regularity."[48] In what was likely a response to this market of

---

[43] *Id.* at 38.

[44] *Id.* at 3–4.

[45] Lord Ellenborough's Act, 43 Geo. 3, c. 58, § 2 (1803).

[46] Act of Sept. 17, 1807, ch. XXIV, 1807 Ind. Acts 323, 323. *See* Ray F. Bowman, III, *English Common Law and Indiana Jurisprudence*, 30 Ind. L. Rev. 409, 413–14 n.25 (1997).

[47] *See State v. Murphy*, 27 N.J.L. 112, 114 (1858). *See also State v. Herring*, 21 Ind. App. 157, 163–64, 48 N.E. 598, 600 (1897) ("Miscarriage or death of the woman must result as a consequence of the unlawful antecedent act or acts done or perpetrated by the accused with the intent to procure the abortion, **or no crime under the statute is committed**.") (emphasis added).

[48] Indianapolis Daily State Sentinel, Jan. 5, 1856, at 2 col. 6.

potentially unsafe treatments, the abortion statute in effect in 1851 (embedded in the poisoning section of the Indiana criminal code), prohibited the willful administration of "any medicine, drug, substance," or other thing to a pregnant woman with the intent to "procure [a] miscarriage," unless to preserve her life.[49] Had abortion been as safe then as it is today, we simply do not know what the framers of 1851 would have done.

Moreover, caselaw from other jurisdictions indicates that, at the time of the Indiana Constitution's drafting, our framers recognized quickening—rather than conception—as the beginning of pregnancy.[50] Contemporary legal treatises, to which our framers certainly had access, likewise characterized a child in the womb as "not possessing an individual existence" and thus unable to be "the subject of murder."[51] To be sure, in *Cheaney v. State* (a pre-*Roe* case finding no fundamental right to abortion under the federal constitution), this Court concluded that, unlike some other states, Indiana "followed" precedent recognizing the common-law "rights of an unborn child **without regard to the state of gestation**."[52] But the cases on which the *Cheaney* Court relied in fact support the contrary conclusion. In *Biggs v. McCarty*, for example, this Court held that, because the "testator died **after the quickening** of the second child**, and at a time when it was legally capable of taking the estate jointly**," the property

---

[49] Act of Feb. 7, 1835, ch. XLVII, 1835 Ind. Acts 66, 66.

[50] *See Smith v. State*, 33 Me. 48, 48 (1851) ("To procure an abortion, as to a female, pregnant *but not quick* with child, was not, at the common law, an offence, if done with her consent."); *Abrams v. Foshee*, 3 Iowa 274, 279 (1856) (concluding that to "cause or procure an abortion, *before* the child is quick, is not a criminal offence at common law, whatever it may be after the child is quick").

[51] Henry Roscoe, et al., A Digest of the Law of Evidence in Criminal Cases 694 (3d ed. 1846). *See* Ind. Supreme Court, A Catalogue of Law Books Contained in the Supreme Court Library 89 (1872) (listing Roscoe's treatise).

[52] 259 Ind. 138, 142–43, 285 N.E.2d 265, 267 (1972) (emphasis added).

vested in the daughter as well as "the child with which she was then pregnant as tenants in common."[53]

Finally, the 1973 amendments to Indiana's abortion law, adopted in response to *Roe v. Wade*, should not, in my view, be taken to suggest that most Hoosiers—by their representatives in the General Assembly—opposed a woman's qualified right to terminate a pregnancy. In passing that bill, the legislature simply declined to acknowledge "a constitutional right to abortion on demand or to indicate that it approves of abortion, except to save the life of the mother."[54] Even one of the legislators who introduced that measure recognized the practical need to legalize abortion to avoid "contributing to the extinction of more lives" than without the law.[55] What's more, the historical record reveals a **shifting** set of views on the issue among our legislators, not a fixed opposition to abortion over time. Just six years prior to the 1973 amendment, both houses of the General Assembly voted to approve a Republican-authored bill to **legalize** abortion in the state—a measure that failed to become law only because the Democratic governor vetoed it.[56] And a 1995 amendment to Indiana's abortion law, adopted in response to *Casey*, contained **no** protest language akin to that in the 1973 measure.[57]

---

[53] 86 Ind. 352, 363 (1882) (emphases added). In *King v. Rea*, the other case on which *Cheaney* relied, this Court held that a child who "was *in ventre sa mere* [in the mother's womb] when the deed was made," was "a person in being, and therefore could take." 56 Ind. 1, 15 (1877). But in reaching this conclusion, the Court pointed out that the child was born four months after the deed was executed. *Id.* (noting that the "date of the deed is in April, 1855" and the child "was born in August, 1855"). In other words, when the deed was executed, the unborn child had quickened, and "therefore could take." *Id.*

[54] Pub. L. No. 322-1973, § 1, 1973 Ind. Acts 1740, 1740–41.

[55] Justin Walsh, The Centennial History of the Indiana General Assembly, 1816–1978, at 624 (1987) (quoting Sen. Gubbins); S. Journal, 98th Gen. Assemb., 1st Reg. Sess. 39 (1973).

[56] Walsh, Centennial History at 584.

[57] *See* Pub. L. No. 187-1995, 1995 Ind. Acts 3327, 3327–29.

In short, the history of abortion in Indiana—its practice and regulation by the state—is much more complex and nuanced than the Court's characterization allows.

## C. There is likely a qualified right to bodily autonomy under Article 1, Section 1.

In weighing the issue before us, it's worth emphasizing what this Court recognized over thirty years ago—that "those who wrote [our] constitution believed that liberty included the opportunity to manage one's own life except in those areas yielded up to the body politic."[58] While our decision in *Lawrance* upheld a patient's right of self-determination to intelligently accept or reject life-sustaining medical treatment, the choice to carry a pregnancy to term involves just as important a private decision for a person "to determine what shall be done with [her] own body."[59] Indeed, pregnancy involves such deeply personal consequences for a woman's body, health, family, and course of life that the right to choose may well comprise an inalienable, core liberty value.[60] If liberty means being "let alone" to "manage one's own life," then some scope for reproductive choice seems essential.[61] It cannot be that, "upon becoming pregnant, women relinquish virtually all rights of personal sovereignty in favor of the Legislature's determination of what is in the common good."[62]

To be sure, Senate Bill 1 itself recognizes a woman's liberty interest, if only in part, by allowing time-limited exceptions for victims of rape and

---

[58] *Matter of Lawrance*, 579 N.E.2d 32, 39 (Ind. 1991).

[59] *See id.* (quoting *Schloendorff v. Soc'y of New York Hosp.*, 105 N.E. 92, 93 (N.Y. 1914)).

[60] *See Price*, 622 N.E.2d at 960 (observing that "there is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate").

[61] *Brizzi*, 837 N.E.2d at 1002 (Boehm, J., dissenting) (quoting *Matter of Lawrance*, 579 N.E.2d at 39).

[62] *See Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 486 (Kan. 2019) (finding a state-constitutional right to abortion).

incest and pregnancies involving a lethal fetal anomaly.[63] But by holding that the legislature retains the discretion "to prohibit abortions which are unnecessary to protect a woman's life or health,"[64] the Court puts these exceptions at risk, effectively inviting the legislature to repeal even the most basic protections to a woman's liberty.

Beyond severe health emergencies and the exceptions mentioned, Senate Bill 1 fails to account for the myriad ways in which denial of abortion access restricts a woman's liberty. It permits the government's invasion of bodily autonomy from the moment of conception and offers no freedom of choice whatsoever in circumstances beyond the statutory exceptions. It seems to me that reproductive liberty is too personal and too important for the General Assembly to set at naught when weighed in the balance against the protection of fetal life. Because Senate Bill 1 fails to recognize a liberty right to reproductive choice or provide any means to balance bodily autonomy against the state's legitimate interest in regulating abortion, there is, in my view, a reasonable likelihood that it is unconstitutional, at least as applied to plaintiffs who, according to the limited record before us, have long provided abortion services safely and are now prohibited from performing even those services that remain legal under Senate Bill 1.

The trial court here recognized this, and our abuse-of-discretion standard of review compels deference to its decision from this Court.[65] Arguably, a trial court abuses its discretion if it misinterprets the constitution.[66] And the "meaning of our [c]onstitution" is generally "a question of law" that "we review de novo."[67] But the trial court needed

---

[63] Ind. Code §§ 16-34-2-1(a)(1)(A)(ii), (a)(2) (2022).

[64] *Ante*, at 41.

[65] *See Indiana Family & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind. 2002) (reiterating that the "grant or denial of a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion").

[66] *See Hayworth v. Schilli Leasing, Inc.*, 669 N.E.2d 165, 167 (Ind. 1996).

[67] *State v. Neff*, 117 N.E.3d 1263, 1267 (Ind. 2019).

only to find a reasonable probability that the Plaintiffs would ultimately prevail. When the "state constitutional issues have never been addressed by this Court,"[68] and when the "underlying constitutional question is close," I find it especially appropriate to "uphold the injunction and remand for trial on the merits."[69] The trial court entered only a temporary injunction, based on a limited, preliminary exchange of briefs and affidavits. The complex constitutional issue here deserves full-scale argumentation on an application for a permanent injunction before a definitive ruling can be made.[70]

I also find no abuse of discretion by the trial court on the remaining preliminary injunction factors. Enforcement of Senate Bill 1 would irreparably harm pregnant women who seek to exercise the choice not to carry a pregnancy to term. As to the balance of the equities and the public interest, I cannot find an abuse of discretion in the trial court maintaining the fifty-year status quo that was mandated by the United States Supreme Court in an effort to balance a woman's liberty against society's interest in fetal life.[71] I would therefore affirm the trial court's temporary injunction to the extent it enjoins enforcement of Senate Bill 1 against Plaintiffs' previously protected abortion activities. I would further remand these proceedings to the trial court for full development of the parties' evidence and arguments on the constitutionality of the statute, or any parts of it, as applied to the Plaintiffs. In the meantime, of course, our colleagues in the General Assembly would be free to consider amending the legislation to account for a woman's qualified right to bodily autonomy or to begin the process of a constitutional referendum.

---

[68] *Doe v. O'Connor*, 781 N.E.2d 672, 674 (Ind. 2003).

[69] *See Ashcroft v. ACLU*, 542 U.S. 656, 664–65 (2004).

[70] For example, the affidavits provided to the trial court by both parties contain little discussion of the impact of the right to abortion on a woman's course of life and, thus, how central that right may or may not be to liberty.

[71] *See Roe*, 410 U.S. at 162–63 (holding that a state's interest in protecting fetal life becomes "compelling" and supports a ban on abortion at the point of viability); *Casey*, 505 U.S. at 861 (describing *Roe*'s viability rule as marking "the point at which the balance of interests tips").